**In re MORTON'S RESTAURANT GROUP, INC. SHAREHOLDERS LITIGATION.**

**C.A. No. 7122–CS.**

Court of Chancery of Delaware.

Submitted: April 30, 2013.
Decided: July 23, 2013.

Peter B. Andrews, Esquire, Craig J. Springer, Esquire, Faruqi & Faruqi, LLP, Wilmington, Delaware; Carmella P. Keener, Esquire, Rosenthal, Monhait & Goddess, P.A., Wilmington, Delaware; Juan E. Monteverde, Esquire, Faruqi & Faruqi, LLP, New York, New York; Joseph E. White, III, Esquire, Jonathan M. Stein, Esquire, Lester R. Hooker, Esquire, Saxena White, P.A., Boca Raton, Florida, Attorneys for Plaintiffs Morton's Restaurant Group Stockholders.

Gregory V. Varallo, Esquire, Richard P. Rollo, Esquire, Thomas A. Uebler, Es-

quire, J. Scott Pritchard, Esquire, Richards, Layton & Finger, P.A., Wilmington, Delaware, Attorneys for Defendants Morton's Restaurant Group Inc., Christopher Artinian, John Castle, Stephen Paul, David Pittaway, Dianne Russell, William Anton, John Connolly, Robert Goldschmidt, Zane Tankel, and Alan Teran.

Bruce L. Silverstein, Esquire, Elena C. Norman, Esquire, Kathaleen St. J. McCormick, Esquire, Young Conaway Stargatt & Taylor, LLP, Wilmington, Delaware, Attorneys for Defendants Fertitta Morton's Restaurants, Inc. and Fertitta Morton's Acquisition, Inc.

Donald J. Wolfe, Jr., Esquire, T. Brad Davey, Esquire, Justin Morse, Esquire, Potter Anderson & Corroon LLP, Wilmington, Delaware; Brian A. Herman, Esquire, Morgan, Lewis & Bockius LLP, New York, New York, Attorneys for Defendant Jefferies & Company, Inc.

Henry E. Gallagher, Jr., Esquire, Ryan P. Newell, Esquire, Connolly Gallagher LLP, Wilmington, Delaware; Geoffrey J.

Ritts, Esquire, P. Nikhil Rao, Esquire, Jones Day, Cleveland, Ohio, Attorneys for Defendant KeyBanc Capital Markets Inc.

## OPINION

STRINE, Chancellor.

### I. *Introduction*

After receiving substantial discovery, both before and after abandoning an attempt to enjoin a tender offer and second-step merger between a corporation and an arm's-length purchaser, the plaintiffs in this case filed a second amended complaint (the "Complaint").[1] The defendants have moved to dismiss the Complaint. The key facts pertinent to the pending motion are drawn, as they must be, from the Complaint and the documents it incorporates.[2] In connection with the transaction, the plaintiffs have received substantial discovery, including depositions that must be considered as fully incorporated into the Complaint given the plaintiffs' extensive use of them.[3] More importantly, the Com-

---

**1.** *See* Second V. Am. Compl. [hereinafter Compl.].

**2.** *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 168–69 (Del.2006).

**3.** Under both Delaware and federal law, on a motion to dismiss, there are limited exceptions to the prohibition against considering documents that are not attached to the complaint. *In re Santa Fe Pac. Corp. S'holder Litig.*, 669 A.2d 59, 69–70 (Del.1995). In addition to documents attached by the plaintiff, the court may consider documents that are "incorporated by reference" or "integral" to the complaint. *Wal–Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 320 (Del.2004); *H–M Wexford LLC v. Encrop, Inc.*, 832 A.2d 129, 139 (Del.Ch.2003). "To be incorporated by reference, the complaint must make a clear, definite and substantial reference to the documents." *DeLuca v. AccessIT Gp., Inc.*, 695 F.Supp.2d 54, 60 (S.D.N.Y.2010). Despite the plaintiffs' plain reliance on and substantial references to the discovery taken in connection with their preliminary injunc-

tion application, the plaintiffs argue that the four deposition transcripts attached by the defendants to their brief cannot be considered on this motion. *See, e.g.*, Compl. ¶ 3 ("Indeed, *as confirmed through discovery*, Castle Harlan ....'' (emphasis added)); *id.* ¶ 4 ("*Discovery has revealed* that Defendants ....'' (emphasis added)); *id.* ¶ 44 ("Several Castle Harlan communications *obtained through discovery* demonstrate that ....'' (emphasis added)). I disagree. Generally, the harm of considering any materials not attached by the plaintiff "is the lack of notice that the material may be considered." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152–53 (2d Cir.2002). Here, the plaintiffs have relied on the four depositions, which they took in conjunction with these proceedings, to construct their Complaint, citing them 28 times. Those substantial references, which include selective quotations, incorporated the depositions by reference. Where, as here, there is no concern that the plaintiffs would not have notice that the defendants would want to put those selective quotations

plaint is largely based on pervasive references to the company's Schedule 14D–9 Recommendation Statement (the "Recommendation Statement") filed in connection with the tender offer, and that document must also be considered as having been incorporated in the Complaint as well.[4] Indeed, the plaintiffs themselves essentially conceded at oral argument that the Complaint makes pervasive use of the Recommendation Statement.[5] In recognition of the latter reality, the plaintiffs made some further concessions about the fundamental facts of the process that led to the

transaction whose fairness they challenge.[6] As important as what the Complaint alleges and incorporates by reference is what the Complaint does not contain. As will be seen, the Complaint is devoid of, among other things, well-pled facts compromising the independence of a supermajority of the board, challenging the adequacy of the board's market check, or suggesting that any bidder received favoritism.

In this decision, I apply the relevant procedural context, by considering only the Complaint and the documents it incorporates, and construing the well-pled facts

---

in context, the exceptions to the general rule that extraneous evidence should not be considered have particular force. *Santa Fe*, 669 A.2d at 69–70; *Chambers*, 282 F.3d at 152–53. I therefore conclude that the depositions have been incorporated by reference. But I note that, although the depositions are incorporated by reference, the outcome of this motion does not turn on this point, as the lack of citations to the depositions in this decision makes plain.

4. *See, e.g., In re Synthes, Inc. S'holder Litig.,* 50 A.3d 1022, 1026 (Del.Ch.2012) ("Having premised their recitation of the facts squarely on [the Proxy Statement] and incorporated it, the plaintiffs cannot fairly, even at the pleading stage, try to have the court draw inferences in their favor that contradict that document, unless they plead non-conclusory facts contradicting it." (citing *In re BHC Commc'ns S'holder Litig., Inc.,* 789 A.2d 1, 13 (Del.Ch. 2001))); *Freedman v. Adams,* 2012 WL 1345638, at *5 (Del.Ch. Mar. 30, 2012) ("When a plaintiff expressly refers to and heavily relies upon documents in her complaint, these documents are considered to be incorporated by reference into the complaint[.]"); *e4e, Inc. v. Sircar,* 2003 WL 22455847, at *3 (Del.Ch. Oct. 9, 2003) (concluding that the court could consider a letter not attached to the complaint because "the wrongful conduct alleged to have been engaged in by [the defendant] was taken directly from that ... letter"); *accord DeLuca,* 695 F.Supp.2d at 59 ("Pleadings include not just the four corners of the complaint, but also *any written instrument* attached to it as an exhibit or any statements or documents incor-

porated in it by reference." (emphasis added)).

5. Mot. To Dismiss Oral Arg. Tr. 37:11–16 (Apr. 30, 2013) ("Q: And you're not contesting that ... you drew most of your allegations from the [Recommendation Statement]; right? A: Well, we drew our allegations from the [Recommendation Statement] and publicly available information, press releases.") [hereinafter Oral Arg. Tr.].

6. The plaintiffs have conceded that the process lasted nine months and that it was unhurried. *Id.* 37:20–38:7, 39:1–2 ("Well, we're not alleging that that it was rushed."). They have also conceded that they have not alleged that the board contacted too few buyers, admitting that over 100 potential buyers were contacted. *Id.* 37:8–10 ("They originally contacted according to the [Recommendation Statement], 137 companies."); *id.* 39:10–11 ("Q: Are you claiming that they reached out to too few a number of buyers? A: Judge, we're not making that allegation, either."). In fact, the plaintiffs have failed to identify a logical buyer that was not contacted. *Id.* 40:2–5 ("Q: Do you identify any plausible buyers that you believe they failed to contact? A: We do not have any allegation such at that, Your Honor."). They have also admitted that they have not alleged that the board was resistant to working with any potential buyer. *Id.* 39:24–40 ("I don't believe we alleged [any resistance]."). And, finally, they have admitted that about 90% of the stockholders tendered their shares in the transaction. *Id.* 56:13–15 ("I believe it was close to 90 percent. I don't have an exact number in front of me....").

in favor of the plaintiffs in order to determine whether the Complaint states a conceivable claim.[7] I may only grant the motion if the "plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances."[8] But, importantly, I am only required to accept those reasonable inferences that flow "logically" from the non-conclusory facts pled in the Complaint, and I am not required to accept "every strained interpretation of the allegations proposed by the plaintiff[.]"[9]

The Complaint, as fully incorporated, reveals the following undisputed course of events. Morton's Restaurant Group ("Morton's") is a chain of high-end steakhouses.[10] Until 2012, it was a public company listed on the NYSE.[11] Its former private equity sponsor, Castle Harlan, Inc. ("Castle Harlan"), held 27.7% of its stock and placed two of its executives on the board, one of whom served as de facto chairman of the board.[12] The remainder of the ten member board was comprised of one insider, the CEO Christopher Artinian, and seven directors who qualified as independent under the NYSE rules and were not employees of Castle Harlan.[13]

In January 2011, Castle Harlan allegedly suggested that Morton's consider selling itself and the board of Morton's agreed.[14] After a nine-month search process involving a full market check for a buyer, Morton's eventually entered into a merger agreement (the "Merger Agreement") with Fertitta Morton's Restaurants, Inc. and Fertitta Morton's Acquisition, Inc. (collectively "Fertitta"), both of which are wholly owned by subsidiaries of Landry's, Inc., on December 15, 2011. The terms of the Merger Agreement provided that the stockholders would receive $6.90 per share, which represented a 33% premium over Morton's closing market price[15] and a 41.9% premium to the weighted average price of the stock for the three-year period before the announcement of the transaction.[16] All of the stockholders were to receive the same per share consideration, *i.e.*, the control premium was shared ratably with all the stockholders.[17]

The plaintiffs, former stockholders of Morton's, have attacked the transaction, alleging in their Complaint that Castle Harlan, acting in its own self-interest, caused the board of Morton's to sell the company "quickly," without regard to the long-term interests of the public shareholders.[18] Although the plaintiffs now do not dispute that every likely buyer was

**7.** *See Gen. Motors*, 897 A.2d at 168.

**8.** *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Hldgs. LLC*, 27 A.3d 531, 535 (Del. 2011) (citation omitted).

**9.** *Malpiede v. Townson*, 780 A.2d 1075, 1083 (Del.2001).

**10.** Compl. ¶ 13.

**11.** *Id.*

**12.** *Id.* ¶¶ 3, 32, 43.

**13.** *Id.* ¶¶ 15, 18–23.

**14.** *Id.* ¶¶ 43–45.

**15.** *Id.* ¶¶ 46–47, 56.

**16.** Morton's Restaurant Group, Inc. Recommendation Statement 25 (Schedule 14D–9) (Dec. 31, 2011) [hereinafter Recommendation Statement].

**17.** Compl. ¶ 56.

**18.** *Id.* ¶¶ 1–11 (citing Pittaway Dep. 49:15–22, 169:22–170:2, 170:5–21, 170:22–171:5, 173:204; Berman Dep. 23:4–24:3, 24:12–25:21, 27:14–24; Tibe Dep. 55:24–56:6, 142:9–18; Recommendation Statement 34–35, 41–42); *id.* ¶ 45 ("[T]he M & A Committee was only interested in selling the Company *quickly* to monetize Castle Harlan's interest, not in getting the highest price for shareholders." (emphasis added)).

contacted,[19] that Castle Harlan benefited from the transaction pro rata with the other stockholders, that a majority of the board, who were independent and disinterested, approved the transaction following a broad search for buyers in a process lasting nine months, that the winning bidder had no ties to a board member of Morton's or Castle Harlan, that Fertitta made the highest binding offer, and that over 90% of the stockholders tendered their shares, the plaintiffs say that despite these facts, the Complaint cannot be dismissed because the transaction is subject to entire fairness review. According to the plaintiffs, the mere presence of a controlling stockholder in a transaction—regardless of whether the controller receives anything different from the other stockholders—triggers entire fairness review. Therefore, in an attempt to sustain their Complaint, the plaintiffs allege, but without the support of particular facts, that Castle Harlan was a controlling stockholder that dominated the company's board of directors.[20]

In addition, the plaintiffs claim that the sale to Fertitta is subject to entire fairness review by suggesting that Castle Harlan had a conflict of interest because it had a unique liquidity need that caused it to push for a sale of Morton's at an inadequate price.[21] The plaintiffs say that the company's eight directors unaffiliated with Castle Harlan acquiesced in Castle Harlan's plan and approved a lowball transaction because they were willing to put the liquidity needs of the company's controller, Castle Harlan, above their fiduciary duties to the stockholders of Morton's.[22] As such, the plaintiffs claim that the board breached their fiduciary duty of loyalty.[23] The Complaint further alleges that the buyer (Fertitta) and the company's two financial advisors (Jefferies and KeyBanc) conspired with the board and Castle Harlan to sell Morton's cheaply, and thus aided and abetted the board's breach of fiduciary duty.[24]

But the plaintiffs' attempt to invoke entire fairness scrutiny fails on two levels. First, they point to no authority under Delaware law that a stockholder with only a 27.7% block and whose employees comprise only two out of ten board seats creates a rational inference that it was a controlling stockholder. Under our Supreme Court precedent in decisions like *Kahn v. Lynch Communication Systems,* the plaintiffs' allegations fall short of creating a rational inference that Castle Harlan had effective control of Morton's, and thus was a controlling stockholder, especially where the Complaint does not even attempt to cast into doubt the independence of the seven disinterested directors from

**19.** Oral Arg. Tr. 40:2–5.

**20.** Pls.' Br. in Opp'n 14–18.

**21.** Compl. ¶¶ 41–45 (citing Pittaway Dep. 30:18–23, 31:7–10, 31:18–32:7, 38:4–21).

**22.** *E.g., id.* ¶ 44 ("Several Castle Harlan communications obtained through discovery demonstrate that Castle Harlan exerted considerable control and influence over Morton's to ensure that its investment would be cashed out.... Indeed, a January 17, 2012 email exchange between [two] directors all but confirms Castle Harlan's control over Morton's ....") (citing Pittaway Dep. 38:4–21).

**23.** *Id.* ¶¶ 85–89 (Count I's claim for breach of fiduciary duty against the board of Morton's and Castle Harlan).

**24.** *Id.* ¶¶ 90–96 (Count II's claim for aiding and abetting breach of fiduciary duty against Landry's, Fertitta's owner); *id.* ¶¶ 97–99 (Count III's claim for aiding and abetting breach of fiduciary duty against Jefferies); *id.* ¶¶ 100–02 (Count IV's claim of aiding and abetting breach of fiduciary duty against KeyBanc).

the alleged controller.[25]

Second, even if Castle Harlan could be considered a controlling stockholder, the plaintiffs have failed to make any well-pled allegations indicating that Castle Harlan had a conflict of interest with the other stockholders of Morton's. That is, the plaintiffs plead no facts supporting a rational inference that it is conceivable that Castle Harlan's support for an extended market check involving an approach to over 100 bidders in a nine-month process reflected a crisis need for a fire sale. As is recognized by decisions like *Unitrin, Inc. v. American General Corp.*, Delaware law presumes that large shareholders have strong incentives to maximize the value of their shares in a change of control transaction.[26] When a large stockholder supports an arm's-length transaction resulting from a thorough market check that spreads the transactional consideration ratably across all stockholders, Delaware law does not regard that as a conflict transaction. To the contrary, as cases like *Citron v. Fairchild Camera and Instrument Corp.* and *In re Synthes* point out, such conduct presumptively considers equal treatment as a safe harbor and immunizes the transaction because it allows all the stockholders to share in the benefits of a transaction equally with the large blockholder.[27]

Because the Complaint does not plead any facts supporting a rational inference of a conflict of interest on Castle Harlan's or on any board member's part, the Complaint fails to plead a viable damages claim. Given that Morton's has an exculpatory charter provision, the plaintiffs must plead a non-exculpated claim that the directors of Morton's breached their duties under *Revlon*.[28] Because the Complaint fails to plead any rational motive for the directors to do anything other than attempt to maximize the sale value of Morton's, it fails. In this regard, the plaintiffs face the reality that under *Revlon*, the duty of the board was to take a reasonable course of action to ensure that the highest value reasonably attainable was secured.[29] When in the course of the pleading stage, the plaintiffs concede that a board reaches out to over 100 buyers, signs up over 50 confidentiality agreements, treats all bidders evenhandedly, and employs two qualified investment banks to help test the market, they provide no basis for the court to infer that there was any *Revlon* breach, much less a non-exculpated one, under our Supreme Court precedent in cases like *Lyondell Chemical Co. v. Ryan*.[30] Likewise, the plaintiffs' quibbles over the investment bankers' analyses the plaintiffs disagree with provide no basis for inferring a *Revlon* breach of any kind, and certainly no basis to question why a board

**25.** 638 A.2d 1110, 1113–14 (Del.1994) (defining a minority controlling stockholder as a blockholder that exercises actual control over the corporation's conduct).

**26.** 651 A.2d 1361, 1380–81 (Del.1995).

**27.** *Citron v. Fairchild Camera & Instrument Corp.*, 569 A.2d 53, 66 (Del.1989) (finding that a director, who was also the representative of a large stockholder, was not "interested" in a merger when the director had not sought "more favorable terms for a buy-out of [the large stockholder's] shares than the shares of the remaining ... stockholders"); *In re*

*Synthes, Inc. S'holder Litig.*, 50 A.3d 1022, 1039–40 (Del.Ch.2012) (discussing the incentives controlling stockholders receive to share the control premium ratably with other stockholders).

**28.** *Malpiede v. Townson*, 780 A.2d 1075, 1083–84 (Del.2001).

**29.** *Revlon, Inc. v. MacAndrews & Forbes Hldgs., Inc.*, 506 A.2d 173, 182 (Del.1986); *see also Barkan v. Amsted Indus., Inc.*, 567 A.2d 1279, 1286 (Del.1989).

**30.** 970 A.2d 235, 239 (Del.2009).

of directors would recommend a premium-generating transaction that came after such a thorough market check.[31]

For all these and other reasons, the defendants' motion to dismiss the Complaint is granted.

## II. *Legal Analysis*

### A. *The Plaintiffs Must Plead a Non–Exculpated Breach Of Fiduciary Duty*

The plaintiffs have argued for application of either the entire fairness standard of *Kahn v. Lynch Communication Systems* [32] or enhanced scrutiny of *Revlon.*[33] The defendants, for their part, have argued that the Complaint fails to state a

claim for relief because it does not plead any non-exculpated breach of fiduciary duty.[34] Although the parties agree that this is a transaction that triggered the board's fiduciary duty to obtain the highest price reasonable available under the *Revlon* doctrine, the plaintiffs still must plead a non-exculpated claim of breach of fiduciary duty because Morton's had an exculpatory provision authorized by 8 *Del. C.* § 102(b)(7) that immunizes the directors for liability for money damages as a result of the breach of the duty of care.[35] As our Supreme Court explained in *Malpiede v. Townson:*

> *Revlon* neither creates a new type of fiduciary duty in the sale-of-control con-

**31.** *In re 3Com S'holders Litig.,* 2009 WL 5173804, at *7 (Del.Ch. Dec. 18, 2009).

**32.** *Revlon,* 506 A.2d at 182.

**33.** 638 A.2d 1110, 1116 (Del.1994).

**34.** The transaction was approved by 92% of the stockholders in a non-coerced, fully informed manner. Oral Arg. Tr. 56:13–15. This includes a strong supermajority of stockholders other than Castle Harlan (who, as will be discussed, was unconflicted too). Traditionally, our equitable law of corporations has applied the business judgment rule standard of review to sales to arm's-length buyers when an informed, uncoerced vote of the disinterested electorate has approved the transaction. *Michelson v. Duncan,* 407 A.2d 211, 224 (Del.1979); *In re Lukens Inc. S'holders Litig.,* 757 A.2d 720, 736–38 (Del.Ch.1999); *Harbor Fin. Prs. v. Huizenga,* 751 A.2d 879, 890 (Del.Ch.1999); *In re Wheelabrator Techs., Inc. S'holders Litig.,* 663 A.2d 1194, 1205 (Del.Ch.1995). This effect on the standard of review is, of course, only available to disinterested stockholder approval for good reason—only disinterested stockholder approval is a strong assurance of fairness. *E.g., Marciano v. Nakash,* 535 A.2d 400, 405 n. 3 (Del.1987) ("[A]pproval by fully-informed ... *disinterested stockholders* ... permits invocation of the business judgment rule and limits judicial review to issues of gift or waste with the burden of proof upon the party attacking the transaction." (emphasis added)). In fact, some prec-

edent of our Supreme Court has gone so far as to hold that a disinterested stockholder who votes for and accepts the consideration offered in a third-party merger upon full information cannot challenge the transaction as unfair. *E.g., Bershad v. Curtiss–Wright Corp.,* 535 A.2d 840, 848 (Del.1987) ("[W]hen an informed minority shareholder either votes in favor of the merger, or like [the plaintiff here], accepts the benefits of the transaction, he or she cannot thereafter attack its fairness.") But without going as far as *Bershad,* it is plain that, when disinterested approval of a sale to an arm's-length buyer is given by a majority of stockholders who have had the chance to consider whether or not to approve a transaction for themselves, there is a long and sensible tradition of giving deference to the stockholders' voluntary decision, invoking the business judgment rule standard of review, and limiting any challenges to the difficult argument that the transaction constituted waste. *Huizenga,* 751 A.2d at 895–900 (tracing the origins of the waste doctrine). The defendants here, however, have not made this particular argument. Therefore, I address the pleading viability of the plaintiffs' Complaint, without giving any standard of review effect to the disinterested, fully informed stockholder approval.

**35.** *See Paramount Commc'ns, Inc. v. QVC Network Inc.,* 637 A.2d 34, 46–48 (Del.1994); *Barkan v. Amsted Indus., Inc.,* 567 A.2d 1279, 1286 (Del.1989).

text nor alters the nature of the fiduciary duties that generally apply. Rather, *Revlon* emphasizes that the board must perform its fiduciary duties in the service of a specific objective: maximizing the sale price of the enterprise. Although the *Revlon* doctrine imposes enhanced judicial scrutiny of certain transactions involving a sale of control, it does not eliminate the requirement that plaintiffs plead sufficient facts to support the underlying claims for ... breach of fiduciary duties in conducting the sale.[36]

■ "[T]his means that the defendant directors are entitled to dismissal unless the plaintiffs have pled facts that, if true, support the conclusion that the defendant directors failed to secure the highest attainable value as a result of their own bad faith or otherwise disloyal conduct." [37] That is, if a corporation has an exculpatory provision in its certificate of incorporation under 8 *Del. C.* § 102(b)(7), "application of the exculpatory clause would lead to dismissal unless the Plaintiffs have successfully pleaded a failure to act loyally (or in good faith), which would preclude reliance on the ... provision." [38]

B. *The Plaintiffs' Attempt To Portray An Arm's–Length Merger Involving A Thorough Market Check And Equal Treatment For All Selling Stockholders As A Conflict Transaction Fails*

The plaintiffs attempt to state a non-exculpated claim by arguing that the board of directors acted disloyally by putting the interests of the company's "controlling stockholder," Castle Harlan, above the interests of Morton's, and that the merger should be subject to entire fairness review. This argument, which is based entirely on cursory allegations that are not supported by well-pled facts, fails to sustain the Complaint.

■ For starters, the Complaint fails to plead facts that support a rational inference that Castle Harlan was a controlling stockholder. The plaintiffs' controller theory relies in large part on the conclusion that Castle Harlan, although it was a minority stockholder, possessed the qualities of a dominating controller within the corporation, because Castle Harlan had previously owned the entire company before Morton's was publicly traded.[39] But the plaintiffs have fallen far short of their burden to plead facts supporting a reasonable inference that Castle Harlan was a controlling stockholder.[40]

■ When a stockholder owns less than 50% of the corporation's outstanding stock, "a plaintiff must allege domination by a minority shareholder through actual control of corporate conduct." [41] The bare conclusory allegation that a minority stockholder possessed control is insufficient.[42] Rather, the Complaint must contain well-pled facts showing that the minority stockholder "exercised actual domination and

36. 780 A.2d 1075, 1083–84 (Del.2001).

37. *Wayne Cty. Empl. Ret. Sys. v. Corti*, 2009 WL 2219260, at *10 (Del.Ch. Jul. 24, 2009).

38. *In re NYMEX S'holder Litig.*, 2009 WL 3206051, at *6 (Del.Ch. Sept. 30, 2009) (citing *Lyondell Chemical Co. v. Ryan*, 970 A.2d 235, 239 (Del.2009)).

39. *Id.* at 16–19, 21–24.

40. *See Kahn v. Lynch Commc'n Sys., Inc.*, 638 A.2d 1110, 1113–14 (Del.1994) (holding that a minority stockholder is not a controller unless it exercises actual control over corporate decision-making).

41. *Citron v. Fairchild Camera & Instrument Corp.*, 569 A.2d 53, 70 (Del.1989).

42. *In re Primedia Inc. Deriv. Litig.*, 910 A.2d 248, 257 (Del.Ch.2006).

control over ... [the] directors." [43] That is, under our law, a minority blockholder is not considered to be a controlling stockholder unless it exercises "such formidable voting and managerial power that [it], as a practical matter, [is] no differently situated than if [it] had majority voting control." [44] Accordingly, the minority blockholder's power must be "so potent that independent directors ... cannot freely exercise their judgment, fearing retribution" from the controlling minority blockholder. [45]

The Complaint does not contain well-pled allegations from which I can draw the inference that Castle Harlan was a controlling stockholder. The plaintiffs' conclusory allegation is based solely on three pled facts: (i) that Castle Harlan had a 27.7% stake in the company and two employees on the board; (ii) that a Castle Harlan employee reached out to Jefferies about a possible engagement before the board formally approved the sales process; and (iii) that the board decided to retain Jefferies. [46] The fact that two employees of Castle Harlan sat on the board, without more, does not establish actual domination of the board, especially given that there were eight directors not affiliated with Castle Harlan. [47] Furthermore, although a Castle Harlan employee contacted Jefferies about an engagement before Jefferies' candidacy was put forth to the entire board, it is not unusual for certain directors or members of management to take an active role in spearheading a sales process. [48]

Even when these alleged facts are looked at together and in the light most favorable to the plaintiff, I cannot logically infer that Castle Harlan "exercised actual domination and control over ... [the] directors," who comprised a majority of Morton's board. [49] In *In re Cysive*, this court made, perhaps, its most aggressive finding that a minority blockholder was a controlling stockholder. [50] But in that case, the blockholder not only held 35% of the company's stock, but he was the company's visionary founder, CEO, and chairman. The blockholder, in fact, exercised more power than a typical CEO because he had placed "two of his close family members in executive positions at the company," which gave the blockholder influence over even "the ordinary managerial operations of the

---

**43.** *In re Sea–Land Corp. S'holder Litig.*, 1988 WL 49126, at *384 (Del.Ch. May 13, 1988); *accord Kahn*, 638 A.2d at 1113 (holding that a minority stockholder must *"exercise[ ] control over the business affairs of the corporation"* (emphasis in original) (citation omitted)).

**44.** *In re PNB Hldg. Co. S'holders Litig.*, 2006 WL 2403999, at *9 (Del.Ch. Aug. 18, 2006).

**45.** *Id.*

**46.** Compl. ¶¶ 43–46.

**47.** *Citron v. Fairchild Camera & Instrument Corp.*, 569 A.2d 53, 66 (Del.1989); *In re Primedia*, 910 A.2d at 258; *see also Aronson v. Lewis*, 473 A.2d 805, 815 (Del.1984) ("[E]ven proof of majority ownership of a company does not strip the directors of the presumptions of independence, and that their acts have been taken in good faith and in the best interests of the corporation. There must be coupled with the allegation of control such facts as would demonstrate that through personal or other relationships the directors are beholden to the controlling person.").

**48.** *Wayne Cty. Empls.' Ret. Sys. v. Corti*, 2009 WL 2219260, at *11 (Del.Ch. July 24, 2009), *aff'd*, 996 A.2d 795 (Del.2010); *accord* Franklin Balotti & Jesse A. Finkelstein, *The Delaware Law of Corporations & Business Organizations* § 6.55 (citing cases).

**49.** *In re Sea–Land Corp. S'holders Litig.*, 1988 WL 49126, at *384 (Del.Ch. May 13, 1988); *accord Kahn v. Lynch Commc'n Sys., Inc.*, 638 A.2d 1110, 1113 (Del.1994).

**50.** *In re Cysive, Inc. S'holders Litig.*, 836 A.2d 531, 551–52 (Del.Ch.2003).

company."[51] Under these circumstances, the court found that that the minority stockholder possessed, "as a practical matter, ... a combination of stock voting power and managerial authority that enable[d] him to control the corporation, if he so wishe[d]."[52] The facts pled about Castle Harlan's "control" do not rise to the same level as the blockholder in *Cysive*. Not only did Castle Harlan hold less than 30% of the company's voting power, the Complaint is devoid of any well-pled facts about any influence Castle Harlan had over any of the unaffiliated directors, who comprised a supermajority of the board. Nothing in the Complaint suggests that Castle Harlan could "control the corporation, if [it] so wishe[d]."[53]

Along with their failure to plead facts supporting an inference that Castle Harlan was a controlling stockholder, the plaintiffs have failed to plead facts supporting an inference that Castle Harlan had an improper conflict of interest in supporting a sale of Morton's after a full market check. The fact that a corporation has a controlling stockholder or large blockholder who suggests a change of control transaction does not automatically subject that transaction to heightened scrutiny.[54] Rather, the presumption is that a large blockholder, who decides to take the same price as everyone else, believes that the sale is attractive, and thus is a strong indication of fairness and that judicial deference is due.[55] In most situa-

**51.** *Id.*

**52.** *Id.* at 553.

**53.** *Id.* Although the defendants have approached this case by conceding that *Revlon* applies and arguing that Castle Harlan was not a controlling stockholder, the plaintiffs' *Revlon* controller theory was susceptible to attack on another ground. If it is true that Castle Harlan had control already, the argument that the *Revlon*, rather than the business judgment rule, standard of review applies to a sale of the company for pro rata value to an arm's-length buyer is dubious, given that Morton's would have already been a controlled company. *See, e.g., In re Synthes, Inc. S'holder Litig.*, 50 A.3d 1022, 1035–36 (Del. Ch.2012) ("As a general matter, therefore, if one wishes to protect minority stockholders, there is a good deal of utility to making sure that when controlling stockholders afford the minority pro rata treatment, they know that they have docked within the safe harbor created by the business judgment rule. If, however, controlling stockholders are subject to entire fairness review when they share the premium ratably with everyone else, they might as well seek to obtain a differential premium for themselves or just to sell their control bloc, and leave the minority stuck-in. How this incentive scheme would benefit minority stockholders more than a system creating an incentive for pro rata treatment is something the plaintiffs have not explained,

and my limited mind cannot conjure why it would."); *cf. In re NCS Healthcare, Inc., S'holders Litig.*, 825 A.2d 240, 254–55 (Del. Ch.2002) (concluding that enhanced scrutiny under *Revlon* did not apply in a stock-for-stock merger where the controlling stockholders sold their shares on a pro rata basis to a company without a controlling stockholder and describing that transaction "as the obverse of a typical *Revlon* case"), *rev'd sub nom. on other grounds Omni Care, Inc. v. NCS Healthcare, Inc.*, 822 A.2d 397 (Del.2002). But, because, as will be explained, the plaintiffs cannot even plead a non-exculpated claim under the assumption that *Revlon* applies with full force, recognition of this reality is not necessary to grant the defendants' motion to dismiss.

**54.** *E.g., Orman v. Cullman*, 794 A.2d 5, 20 n. 36 (Del.Ch.2002) ("Recognizing the practical implications of the automatic requirement of an entire fairness review has led our Supreme Court to limit such automatic requirement to the narrow class of cases in which there is a controlling shareholder on *both sides* of a challenged merger.").

**55.** *See, e.g., Synthes*, 50 A.3d at 1035 (explaining that in transactions with third-party buyers, controlling stockholders are "typically ... well-suited to help the board extract a good deal on behalf of the other stockholders because they usually have the largest financial

tions, the controlling stockholder has interests identical to other stockholders: to maximize the value of its shares.[56] Thus, there are only "narrow circumstances" where a controlling stockholder's desire to sell in a transaction according equal treatment to all stockholders would create a disabling conflict of interest.[57] Those unusual circumstances "involve a crisis, a fire sale" in which the pressure on the controller to sell quickly is so high that the controller imposes pressure on the corporation to artificially truncate the market check and forgo the additional value that could be brought about by making "logical buyers aware" that the company is for sale and giving them a reasonable time and fair opportunity to consider whether to make an offer.[58]

The plaintiffs' Complaint fails to plead facts supporting a rational inference that Castle Harlan had a conflict of interest, because it needed cash immediately to "gain liquidity for [its] new investment fund."[59] The plaintiffs allege that Castle Harlan, "which typically flips companies it invests in every three to five years, wanted to divest its majority ownership of Morton's."[60] According to the Complaint, the reason that Castle Harlan wanted to sell Morton's was that "[t]he Castle Harlan fund that owned Morton's, Castle Harlan III, L.P., was closed for investment and Castle Harlan was now investing in a new fund, Castle Harlan Partners V."[61] These

sparse and confusing allegations about Castle Harlan's motivation to sell Morton's in a rushed transaction make it hard for the court to discern what disabling conflict of interest the plaintiffs suggest Castle Harlan had. Indeed, the plaintiffs fail to allege with any particularity what motivated Castle Harlan to sell. Nevertheless, looking at the Complaint and the plaintiffs' briefing in the most favorable light, it seems that the plaintiffs are alleging that Castle Harlan pressured the board to sell Morton's quickly so that Castle Harlan itself would get some liquidity to reinvest in its new Fund V, or so that Castle Harlan could cash out the investors in Fund III and those investors would have money to reinvest in Castle Harlan's new Fund V.

Neither theory provides a rational basis to sustain the Complaint. Most importantly, by backing away from the contention that the transaction was rushed and by conceding that all logical buyers were made aware of the transaction, the plaintiffs have essentially admitted that Castle Harlan did not cause Morton's to be sold at less than fair market value in a rushed fire sale, but that it simply supported the sale of the company after a full and unhurried market check.[62] Given that all logical buyers were made aware that Morton's was for sale and that they all had the time and fair opportunity to bid, after having access to due diligence, no logical inference

stake in the transaction and thus have a natural incentive to obtain the best price for their shares"); *In re CompuCom Sys., Inc.*, 2005 WL 2481325, at *6 (Del.Ch. Sept. 29, 2005) ("[A]s the owner of a majority share, the controlling shareholder's interest in maximizing value is directly aligned with that of the minority."); *Goodwin v. Live Entm't, Inc.*, 1999 WL 64265, at *27 (Del.Ch. Jan. 25, 1999) (noting that a controlling stockholder has a "natural desire to obtain the best price for its shares"), *aff'd*, 741 A.2d 16 (Del.1999).

**56.** *Id.; accord Unitrin, Inc. v. Am. Gen. Corp.*, 651 A.2d 1361, 1380–81 (Del.1995).

**57.** *Synthes*, 50 A.3d at 1036.

**58.** *Id.*

**59.** Pls.' Br. in Opp'n 21–22.

**60.** Compl. ¶ 40.

**61.** *Id.* ¶ 44.

**62.** Oral Arg. Tr. 37:20–38:10, 39:1–2, 40:2–5.

can be made that Morton's was sold at a compromised value in a hasty process to meet some (entirely hypothetical) need of Castle Harlan for cash (for itself or to return to its investors).

But even if the plaintiffs had not made those concessions at oral argument, the Complaint, as written, would still fail to create the inference that Castle Harlan had a conflict of interest. For one thing, the plaintiffs' liquidity theory is grounded on the proposition that a private equity firm that controls a large block of a public company will force a sale at a suboptimal price whenever it is in the process of starting a new investment fund. That situation, which many firms in the industry face on a regular basis, and therefore is hardly unique, is not some unusual crisis, requiring a fire sale. As important, it is not at all clear from the Complaint how selling Morton's would address any liquidity concern of Castle Harlan. This is not a situation where 27.7% of Morton's was owned by the principals of Castle Harlan as a private equity complex. Rather, 27.7% of Morton's was owned by a fund set up by Castle Harlan. The only conceivable reality is—and the plaintiffs plead no facts to the contrary—that the bulk of any proceeds from the sale of Morton's went to investors of Castle Harlan's expiring fund that owned part of Morton's (Castle Harlan III, L.P.), not to Castle Harlan itself. And, even if the plaintiffs' theory was that Castle Harlan rushed the sale to free up investors from Fund III to invest in Castle Harlan's new Fund V, the argument still fails to create a pleading stage inference that Castle Harlan had a disabling conflict

of interest: if Castle Harlan sold out the investment in Morton's at a low price, it would hurt Castle Harlan on a going forward basis, because the investors in Fund III would be unlikely to invest in the new Fund V if they viewed Castle Harlan as having compromised their interests as an investor in Fund III. Although the dismissal standard is plaintiff-friendly, the plaintiffs are still bound to plead non-conclusory facts that, if true, conceivably support a cause of action. The plaintiffs have fallen short by accusing Castle Harlan of being conflicted solely because it was raising money for a new fund.

In addition to making no sensible arguments as to how, or why, Castle Harlan would not attempt to maximize the return on the older fund that contained its investment in Morton's, the plaintiffs' argument about Castle Harlan's immediate need to sell at all costs plainly conflicts with the facts pled and incorporated into the Complaint about the *nine-month* sales process in which the board canvassed the market for a suitable buyer. Jefferies, the board's initial financial advisor, kicked off the process by widely circulating a press release about the company's exploration of strategic alternatives on March 16, 2011.[63] Jefferies began contacting potential buyers the next day.[64] Over the next nine months, Morton's contacted 137 potential buyers, executed 52 confidentiality agreements, conducted due diligence with interested parties, and evaluated several nonbinding bids.[65] Although the plaintiffs make cursory allegations that the board was somehow biased toward Fertitta in their complaint,[66] no pled facts support

63. *Id.* ¶ 46.

64. *Id.* ¶ 47.

65. Recommendation Statement 15.

66. *E.g.,* Compl. ¶ 84 ("The preferential treatment accorded to Landry's deprived Morton's

stockholders of the very substantial premium which unfettered and evenhanded exposure of the Company to the market could have produced."); *id.* ¶ 86 ("These Defendants ... avoided competitive bidding and provided Landry's with an unfair advantage by effectively excluding other alternative proposals.").

that inference and by the time of oral argument, the plaintiffs had entirely backed away from claiming that Fertitta was favored.[67] The reason that the plaintiffs backed down from that argument is not hard to discern: the Complaint itself is devoid of any facts about any affiliation between Fertitta and Castle Harlan or any of the directors of Morton's. More importantly, the allegation of favoritism conflicts with the undisputed facts. Before finalizing a deal with Fertitta, the board had approved an exclusivity agreement, granting another bidder, "Party E," which had floated a price of $7.25 per share, the right to negotiate exclusively with the board in order to finalize a deal.[68] The board entertained Fertitta's bid for $6.90 only after Party E revised its bid down, lost its exclusivity agreement, and refused to raise its bid above $6.50.[69] Therefore, the Complaint does not create a rational inference that this was a rushed process or that the board favored Fertitta: the plaintiffs themselves admit that they cannot identify a single logical buyer that Morton's did not contact;[70] the board negotiated terms with multiple bidders; and Fertitta's offer was ultimately the highest. The Complaint thus fails to plead facts supporting a pleading stage inference that Castle Harlan, after holding Morton's stock for over five years, faced some exigent crisis that suddenly compelled it to sell its shares in a deal that was not reasonably designed to let it receive top dollar for Morton's.[71]

Because there is no logical inference that Castle Harlan had a liquidity interest that was at odds with the other stockholders of Morton's, I cannot draw the inference that the Castle Harlan employees on Morton's M & A Committee, which negotiated the transaction, tainted the sales process.[72] Put simply, Castle Harlan, like every other holder of Morton's common stock, had to consider the tradeoff between selling and the risks of not doing so.[73] There is no hint in the allegations that the board refused to consider or rejected a deal that was worth more than Fertitta's offer. Therefore, the Complaint fails to plead facts supporting the wholly conclusory allegation that the four-member M & A Committee, which had two Castle Harlan employees, "was only interested in selling the Company quickly to monetize Castle Harlan's interest, not in getting the highest price for shareholders." [74]

As with the Castle Harlan directors, the Complaint does nothing to suggest that the other directors committed a breach of the duty of loyalty. For purposes of this argument, what is most important is what the Complaint itself does not contain. From

---

67. *See, e.g.,* Oral Arg. Tr. 48:18–49:4.

68. Recommendation Statement 18–19.

69. *Id.* at 19.

70. Oral Arg. Tr. 40:2–5.

71. *In re Synthes, Inc. S'holder Litig.,* 50 A.3d 1022, 1035 (Del.Ch.2012).

72. *See, e.g., Hokanson v. Petty,* 2008 WL 5169633, at *8 (Del.Ch. Dec. 10, 2008) (concluding, in a case where directors were also stockholders, that there was no basis "for inferring that [the] directors would have any reason not to bargain for a higher price in

order to mitigate their financial losses if that option were at all feasible").

73. *See, e.g., In re Dollar Thrifty S'holder Litig.,* 14 A.3d 573, 600 (Del.Ch.2010) (explaining that directors who had "material" holdings in the company's stock had to think about the risks of selling versus retaining stock in a stand-alone company like any other stockholder); *McGowan v. Ferro,* 859 A.2d 1012, 1030 (Del.Ch.2004) (noting that the directors' "substantial stockholdings" created "powerful incentives to get the best deal" in a transaction subject to *Revlon* ).

74. Compl. ¶ 45.

the four corners of the Complaint, it is clear that the Complaint fails to plead any facts compromising the independence of a majority of the board. Nor does the Complaint plead anything to suggest that they had an improper motive, and the mere fact that they agreed with Castle Harlan that it was advisable for Morton's to engage in a thorough, good-faith, and deliberate market check does nothing to support a rational pleading stage inference of disloyalty. To the contrary, the Complaint and the documents it incorporates illustrates that the board of Morton's took great care to test the market in a very full way.

Although every major decision leading up to the transaction and the transaction itself was approved by a board of independent and disinterested directors, the plaintiffs argue that this court should be

reluctant to dismiss their Complaint because to do so would give judicial sanction to a technique core to the "private equity playbook." [75] This technique supposedly involves a private equity firm taking a company private, working to improve its operations and profitability, taking the portfolio company public, retaining a substantial but non-majority stake for several years, and then being open to selling the entire company after a thorough, non-hurried sales process in which it shares the control premium ratably with the company's other investors. [76]

I confess to being flummoxed by this argument. Under the plaintiffs' own theory, they admit that private equity firms, including Castle Harlan here, hold their shares for a period far longer than typical stockholders. [77] Like other stockholders,

75. Compl. ¶ 32; *see also* Pls.' Br. in Opp'n 7 ("Following the typical *private equity playbook,* Castle Harlan generally flips companies it invests in every three to five years.... After nearly six years of investment in a publicly owned Morton's, Castle Harlan was ready to divest its ownership in the company." (emphasis added)).

76. Compl. ¶¶ 40–56; Pls.' Br. in Opp'n 23–31.

77. Oral Arg. Tr. 34:13–15. Many sources indicate that the average holding period for a stock is less than a year. *E.g.,* Schumpeter, *Taking the Long View,* Economist (Nov. 24, 2012), http://www.economist.com/news/business/21567062–pursuit–shareholder–value attracting–criticismnot–all–it–foolish–taking– long ("[T]he average time that people hold a stock on the New York Stock Exchange has tumbled from eight years in 1960 to four months in 2010."); Jesse Eisinger, *Challenging the Long–Held Belief in 'Shareholder Value,'* N.Y. Times DealBook (June 27, 2012, 12:00 PM), http://dealbook.nytimes.com/2012/06/27/challenging-the-long-held-belief-in-shareholder-value ("The average holding period of a stock was eight years in 1960; today, it's four months."); Michael C. Thomsett, *Is "Buy and Hold" the Smartest Investing Strategy?,* Seeking Alpha (Mar. 1, 2012, 11:28 AM), http://seekingalpha.com/instablog/922162–thomsett/184111–is–buy–and–hold–the–

smartest–investing–strategy ("Currently, the average holding period [of an equity security] is under one year."). Admittedly, recently, several scholars have questioned whether stockholding duration data should exclude data from high-frequency traders, and other "short-term" institutions, that trade quickly and frequently on minuscule price distortions. *See, e.g.,* Martjin Cremers et al., *Stock Duration and Misvaluation,* at 2–3 (Dec. 17, 2012), http://ssrn.com/abstract=2190437. Instead, these scholars focus on the average stock holding period of institutional investors and find that institutional investors hold a stock, on average, for 1.5 years. *Id.* at 3–4 (defining stock duration as the "weighted-average length of time that institutional investors have held stock in their portfolios"). But this data slights the data showing that mutual funds that are not index funds turn their portfolios almost once a year. *See, e.g.,* John C. Bogle, *Common Sense on Mutual Funds* 380 (2010) ("Twenty-five years ago, fund portfolio turnover averaged 30 percent annually; today, it averages nearly 90 percent."); Laura Bruce, *Mutual Fund Turnover and Taxes,* BANKRATE.COM (Nov. 6, 2003), http://www.bankrate.com/brm/news/investing/20020306a.asp ("William Harding, an analyst with Morningstar, says the average turnover rate for managed domestic stock funds is 130 percent. Many managers claim to be long-term inves-

private equity firms are entitled to sell at a good price for the benefit of their investors.[78] For actual non-private equity investors who care about the performance of their investment, rather than the creation of a legal theory to help get past a motion to dismiss, the idea that they will receive their ratable share of a control premium after a full and open sales process is not a threat: it is an attractive prospect that rewards them along with the private equity firm [79] and, when it occurs, assures

them that investing in American markets is a sensible thing to do, because small stockholders will receive equal treatment with larger stockholders.[80] In fact, it is a matter of judicial notice [81] that a principal concern of those who represent ordinary investors (and who in fact do the direct investing in public companies for those investors) has been to reduce the barriers to an open market for corporate control, so that stockholders can benefit from sell-side takeover premiums.[82] It would be per-

---

tors when, in reality, the average mutual fund manager is turning the portfolio more than once a year."). But, even if the holding duration of institutional investors is more like 1.5 years, investors still hold their equity investments for a period of time substantially shorter than Castle Harlan here, which held its shares of Morton's for close to six years.

**78.** *See Harris v. Carter*, 582 A.2d 222, 234 (Del.Ch.1990) (noting that it is a principle of law that "a shareholder has a right to sell his or her stock and in the ordinary cases owes no duty in that connection to other shareholders when acting in good faith" (citing *Frantz Mfg. Co. v. EAC Indus.*, 501 A.2d 401, 408 (Del.1985))).

**79.** Because of regulatory hurdles and incentives, most ordinary American investors have no vehicle to entrust a responsible portion of their of their 401(k) savings to private equity, despite the fact that the industry's comparatively more patient model of investing arguably better aligns with retirement investors' goals than active traded mutual funds that chase a better than market return through actively trading in non-influential blocks of equity (in defiance of accepted corporate finance theory).

**80.** *See, e.g., In re Synthes, Inc. S'holder Litig.*, 50 A.3d 1022, 1035 (Del.Ch.2012); *In re CompuCom Sys., Inc.*, 2005 WL 2481325, at *6 (Del.Ch. Sept. 29, 2005); *Goodwin v. Live Entm't, Inc.*, 1999 WL 64265, at *27 (Del.Ch. Jan. 25, 1999), *aff'd*, 741 A.2d 16 (Del.1999). As a purely legal matter, Delaware law permits a large stockholder to receive a premium for her shares instead of participating in a pro rata sale with the corporation's other stockholders. *E.g., Thorpe v. CERBCO, Inc.*, 676 A.2d 436, 442 (Del.1996) (acknowledging that

controlling stockholders "have a right to sell their shares, and in doing so capture and retain a control premium"); *In re Sea–Land Corp. S'holder Litig.*, 1987 WL 11283, at *804 (Del.Ch. May 22, 1987) ("A controlling stockholder is generally under no duty to refrain from receiving a premium upon the sale of his controlling stock.").

**81.** *E.g., In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 170 (Del.2006) (ruling that it was proper for the court below to take judicial notice of publicly availably facts that were not subject to reasonable dispute on a motion to dismiss); *Wilkes v. German*, 316 A.2d 200, 203 (Del.1974) (taking judicial notice that seashore property in Delaware had greatly increased in value because it was a matter of "common knowledge"); *accord* 2 McCormick On Evidence § 329 (7th ed. 2013) ("The oldest and plainest ground for judicial notice is that the fact is so commonly known in the community as to make it unprofitable to require proof, and so certainly known as to make it indisputable among reasonable men.").

**82.** *See, e.g.,* Roberta Romano, *Less Is More: Making Institutional Activism A Valuable Mechanism of Corporate Governance*, 18 Yale J. on Reg. 174, 175 (2001) ("Institutional investors have, in the past decade, increasingly engaged in corporate governance activities ... with the stated goal of improving corporate performance. For example, since the mid–1980s, institutions have submitted to hundreds of firms shareholder proposals on corporate governance consisting principally of proposals to eliminate defensive tactics to takeovers...."); Lucian A. Bebchuk et al., *Staggered Boards and the Wealth of Sharehold-*

verse therefore to penalize all stockholders by embracing the strange argument that the lawyers for these particular plaintiffs make.[83] If that argument was embraced, large stockholders would be encouraged to sell their ownership in a company for a premium that is not shared with other stockholders, because doing the best thing for other stockholders—sharing the control premium ratably—would subject the controlling stockholder to claims of conflict of interest and overreaching.[84] Fortunately for the stockholders of Delaware corporations, our law adopts the approach that is best for all stockholders, particularly those with small holdings, and encourages, by various means, larger stockholders to regard pro rata treatment as a safe harbor.

## C. The Plaintiffs' Issues With The Board's Decision To Allow Jefferies To Finance Fertitta's Deal And Quibbles With The Financial Analyses Do Not State A Non–Exculpated Claim For Relief

In a final attempt to salvage the Complaint, the plaintiffs have argued that two issues involving the investment bankers for Morton's raise an inference that the board breached its fiduciary duties in bad faith. The plaintiffs argue that they have a conceivable non-exculpated breach of fiduciary duty claim because (i) the board's decision to allow its financial advisor, Jefferies, late in the sales process to provide financing for Fertitta's bid was done intentionally to allow Fertitta to lower its bid below a fair price; and (ii) the financial analyses of KeyBanc and Jefferies had such obvious errors that the board could only have relied on the fairness opinions with the intent to approve a lowball transaction.[85]

ers: Evidence from Two Natural Experiments, at 1 (June 1, 2010), http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1706806 (noting that "major institutional investors such as the American Funds, BlackRock, CalPERS, Fidelity, TIAA–CREF, and Vanguard ... all have policies favoring annual election of all directors and board de-staggering proposals" (citations omitted)); ISS 2013 U.S. Proxy Voting Summary Guidelines, at 11, 17 (Jan. 31, 2013), http://issgovernance.com/files/2013 ISSUSSummaryGuidelines1312013.pdf (recommending that stockholders vote against staggered board proposals and against directors who adopt a shareholder rights plan that lacks stockholder oversight); Glass Lewis & Co., Proxy Paper Guidelines: 2013 Proxy Season, at 10 (2012), http://www.glasslewis.com/assets/uploads/2012/02/Guidelines_UnitedStates_2013_Abridged1.pdf (explaining that Glass Lewis "believes that poison pill plans are not generally in shareholders' best interests" because such plans "reduce management accountability by substantially limiting opportunity for corporate takeovers. Rights plans can thus prevent shareholders from receiving a buy-out premium for their stock" (emphasis added)); Glass Lewis & Co., Proxy

Paper Guidelines 2012: An Overview of the Glass Lewis Approach to Proxy Advice, at 18 (2011), http://www.usfunds.com/usgi/assets/File/2012_Proxy_Guidelines_US.pdf (explaining that Glass Lewis opposes staggered boards because "in the context of hostile takeovers, staggered boards operate as a takeover defense, which entrenches management, discourages potential acquirers, and delivers lower return to target shareholders" (emphasis added)).

83. See, e.g., Synthes, 50 A.3d at 1035–36.

84. Id. See generally Ronald J. Gilson & Jeffrey N. Gordon, Controlling Controlling Stockholders, 152 U. Pa. L.Rev. 785 (2003) (discussing ways in which controlling stockholders can extract financial benefits not shared with non-controlling stockholders (such as selling their control block at a premium and leaving the minority stockholder stuck-in) and arguing that the law should encourage controlling stockholders to exercise their control in a manner that benefits non-controlling stockholders).

85. Pls.' Br. in Opp'n 24–28.

But, the pled facts do not support a rational inference that the board's decision to allow Jefferies to finance Fertitta's bid resulted from bad faith.[86] In October 2011, Jefferies reported to the Morton's M & A Committee that Fertitta was having difficulty securing financing for its bid and that Fertitta approached Jefferies about financing the acquisition.[87] The M & A Committee weighed the positives and negatives of letting Jefferies finance Fertitta's deal and discontinue its role as financial advisor to the board.[88] Ultimately, the M & A Committee decided to recommend that the board allow Jefferies to finance Fertitta's bid if (i) Jefferies would recuse itself from further negotiations, (ii) reduce its fee by $600,000, and (iii) still opine on whether the resulting transaction was fair to Morton's once the terms were set.[89] After Jefferies agreed to those terms, the board met, discussed that plan, and approved it.[90] Moreover, the board used Jefferies' reduced fee to hire another advisor, KeyBanc.[91] Although the plaintiffs allege that KeyBanc rubber stamped the deal, the facts pled do not support that wholly conclusory assertion. Indeed, that unsup-

ported conclusion conflicts with the fact that KeyBanc attempted to shop the company to other bidders to get a price above $6.90.[92] The plaintiffs in fact concede that KeyBanc shopped the company but did not find a buyer willing to pay more.[93] The decision to let Jefferies finance Fertitta's deal while hiring KeyBanc to provide unconflicting advice, rather than risk losing a bid at a high premium to market, does not create an inference of bad faith.[94] Based on the well-pled allegations in the Complaint, therefore, it is not conceivable that the board's decision to let Jefferies finance Fertitta's bid was a conscious disregard of their fiduciary duty of loyalty.[95]

 Finally, the plaintiffs' attacks on the fairness opinions also fail to state a non-exculpated breach of fiduciary duty claim against the board of directors.[96] To establish a non-exculpated breach of fiduciary duty claim based on an independent and disinterested board's reliance on its advisors' financial analyses, the plaintiffs must plead non-conclusory facts creating the reasonable inference that the board purposely relied on analyses that were inaccurate for some improper reason.[97] The

---

86. Compl. ¶¶ 53–55.

87. Pls.' Br. in Opp'n 24 (contending that the board's decision to allow Jefferies to provide financing to Fertitta in a transaction in which they had also advised the seller "calls into question the entire sale process").

88. Recommendation Statement 21.

89. *Id.* at 21, 36; *see also* Oral Arg. Tr. 15:10–16:19.

90. Recommendation Statement 21.

91. *Id.* at 21, 36.

92. *Id.* at 23.

93. Oral Arg. Tr. 69:8–11.

94. *Lyondell Chem. Co. v. Ryan*, 970 A.2d 235, 241 (Del.2009).

95. *See Stone v. Ritter*, 911 A.2d 362, 369–70 (Del.2006) (explaining that, in general, a claim for bad faith exists where a fiduciary acted with a purpose other than advancing the interests of the corporation); *White v. Panic*, 783 A.2d 543, 554 (Del. Ch.2001) (explaining that to state a claim for bad faith a plaintiff must allege facts that create an inference that "the board's decision was so egregious or irrational that it could not have been based on a valid assessment of the corporation's best interest").

96. Pls.' Br. in Opp'n 26–28.

97. *See In re Celera Corp. S'holder Litig.*, 2012 WL 1020471, at *25 (Del.Ch. Mar. 23, 2012) (holding that to state a non-exculpated claim based on errors in their financial advisor's analysis requires the plaintiff to make well-pled allegations that "the Board acted in bad faith by relying on what it knew was an

plaintiffs cannot simply quibble with the inputs used in the fairness opinions.[98]

The Recommendation Statement disclosed that Jefferies had performed a discounted cash flow analysis that assumed that Morton's could be at 5.0 to 7.0 times EBITDA in 2016, at the end of the four years for which specific projections for the company's future performance were available.[99] The Recommendation Statement disclosed that this analysis yielded a range of value of $9.03 to $12.34 per share.[100] The Recommendation Statement then indicated that management of Morton's believed that the analysis was too optimistic in that the "range of implied perpetual growth rates … did not reflect management's expectations."[101] The original Jefferies analysis did not use a Gordon Growth Model, but rather used exit multiples that translated into an implied perpetuity growth rate of 9.2%.[102] The Recommendation Statement disclosed that Jefferies then ran the model again using a 2% growth rate, "which management advised Jefferies it considered reasonable."[103] That analysis indicated a range of value of $6.26 to $7.15 per share.[104]

The plaintiffs do not argue that these analyses were not fairly disclosed, they just complain that the 2% perpetuity growth rate ultimately used to support Jefferies' fairness opinion was unreasonably low.[105] But this sort of sidewalk superintending of the banker's advice does not sustain a complaint. The stockholders received a disclosure of Jefferies' analysis without any material omissions, and, therefore, if any stockholder believed that Morton's was likely to sustain the growth rates projected during the first four years and therefore should be sold at the exit multiple in Jefferies' original analysis, that stockholder could refuse to tender and hold out for appraisal.[106] Just as a rational mind could question whether a 2% perpetuity growth rate for Morton's was too low, so too would a rational mind certainly question the 9.2% perpetuity growth rate the plaintiffs advocate, a rate that would suggest that a high-end steakhouse would become the next McDonald's or even Wal–Mart.[107] The stockholders

inaccurate analysis"), *aff'd in part, rev'd in part*, 59 A.3d 418 (Del.2012).

98. *See, e.g., Lynch v. Vickers Energy Corp.*, 383 A.2d 278, 281 (Del.1977) ("Completeness, not adequacy, is both the norm and the mandate under present circumstances."); *In re 3Com S'holders Litig.*, 2009 WL 5173804, at *7 (Del. Ch. Dec. 18, 2009) (finding a claim that "simply amounts to a quibble with the manner in which [the advisor] performed its fairness opinion in connection with the Merger and can be remedied by the appraisal remedy" does not state a claim for relief); *In re SunGard Data Sys., Inc. S'holder Litig.*, 2005 WL 1653975, at *2 (Del.Ch. July 8, 2005) (concluding that "quibbl[es]" with an investment banker's fairness opinion are of "marginal significance" and do not state a claim for relief).

99. Recommendation Statement 34.

100. *Id.*

101. *Id.*

102. *Id.*; Compl. ¶ 69.

103. Recommendation Statement 34.

104. *Id.*

105. *See* Pls.' Br. in Opp'n 22–28.

106. *See* 8 *Del. C.* § 262.

107. A 9% perpetuity growth rate would also imply that Morton's itself would eventually become larger than the U.S. economy, assuming that U.S. nominal gross domestic product continues to grow at less than 9% a year, as it has done so historically. Bradford Cornell, *Corporate Valuation: Tools for Effective Appraisal and Decision Making* 146–47 (1993) ("The long-run real growth rate of growth for the U.S. economy is only on the order of 2 to 3 percent per year. If a company is assumed

also had KeyBanc's financial analysis, which used a perpetuity growth rate of less than 2%, to compare with Jefferies' analysis. Having fairly disclosed management's best estimate of cash flows for the four year projection period, and two analyses using different terminal year assumptions, the directors gave rational stockholders the material information necessary for them to make their own decision about whether to accept the premium being offered by Fertitta then and there, or stick in and hope that bone-in ribeyes begin to sell like Big Macs. Simply put, the stockholders were told what the bankers did and what the key metrics of their analysis involved. Under our law, that is all that was required.[108]

The plaintiffs make the loose and harsh argument that the discrepancies between KeyBanc's and Jefferies' financial analyses create a logical inference that the board of Morton's colluded with its advisors to justify an unfair price.[109] The reality that the two banks used some different assumptions and came to somewhat different outcomes does not create any rational inference of impropriety.[110] Rather, what would be more disturbing would be if somehow two advisors generated by some sort of harmonic convergence, exact replicas of each other's reasoning. The ordinary variations between the two analyses are not well-pled facts that create a reasonable inference that the advisors colluded with the board to justify a lower price, because the plaintiffs failed to plead facts creating an inference that any of the inputs were unreasonable on their face.[111]

---

to grow at a higher rate indefinitely, its cash flow would eventually exceed America's GNP."); *accord* Shannon P. Pratt & Roger J. Grabowski, *Cost of Capital: Applications and Examples* 361 (4th ed. 2010) ("[A perpetual growth rate of 9%] would be *an extreme case.* It is theoretically impossible for the sustainable perpetual growth rate for a company to significantly exceed the growth rate in the economy. Any rate over a 6% or 7% perpetual growth rate should be questioned carefully." (emphasis added)).

**108.** *In re 3Com S'holders Litig.,* 2009 WL 5173804, at *7 (Del.Ch. Dec. 18, 2009); *In re SunGard Data Sys., Inc. S'holder Litig.,* 2005 WL 1653975, at *2 (Del.Ch. July 8, 2005). In the complaint, the plaintiffs also allege that the deal protection devices were unreasonable. But the plaintiffs have waived that argument by not pressing that argument in their brief. *See Roca v. E.I. duPont de Nemours & Co., Inc.,* 842 A.2d 1238, 1243 n. 12 (Del. 2004); *PharmAthene, Inc. v. SIGA Techs., Inc.,* 2011 WL 6392906, at *2 (Del.Ch. Dec. 16, 2011). Even if the plaintiffs had not waived their argument, the modest deal protections contained in the Merger Agreement could not be conceived of as, in any way, preclusive or coercive for two distinct and important reasons. First, they could not have precluded any serious buyer, given that the company's strategic search was so broad that all plausible buyers had a chance to bid for Morton's without facing the inhibiting effect of deal protections at all. *See Barkan v. Amsted Indus., Inc.,* 567 A.2d 1279, 1287 (Del. 1989) (noting that one way a board can get reliable evidence for the value of the company is by performing a pre-signing market check). Second, the 3% termination fee, the no solicitation provision with a fiduciary out, the matching rights, and the top-up provision awarded to the top bidder of a lengthy sale process, could not be considered unreasonable or a serious deterrent to any bidder wishing to make a genuinely more valuable topping bid. *See In re Novell, Inc. S'holder Litig.,* 2013 WL 322560, at *10 (Del.Ch. Jan. 3, 2013) ("The mere inclusion of such routine terms does not amount to a breach of fiduciary duty[.]").

**109.** Pls.' Br. in Opp'n 26–28.

**110.** *E.g., 3Com,* 2009 WL 5173804, at *6 ("There are limitless opportunities for disagreement on the appropriate valuation methodologies to employ, as well as the appropriate inputs to deploy within those methodologies.").

**111.** *In re Celera Corp. S'holder Litig.,* 2012 WL 1020471, at *25 (Del.Ch. Mar. 23, 2012).

When a board of disinterested directors uses two qualified investment banks and reaches out to over 100 potential buyers in an extended effort to induce competition and get the best price, it is not conceivable that they were acting in bad faith simply because the bankers' valuation models do not accord with a plaintiff's birthday dreams of enormous value.[112] Had any of the potential buyers courted by Morton's believed it had a perpetuity growth rate of over 5%, much less 9%, they doubtless would have topped Fertitta and seized the chance to ride ribeyes to riches. But they did not. Most important, the plaintiffs' theory ignores the most important indication of fair market value the board of Morton's had available. Much more than a cold paper analysis, the extensive process employed by the board of Morton's ensured the best of all information bases about the company's value: one resulting from a full exposure of the asset to the market in an extended process that gave all logical buyers access to confidential information and no preclusive barriers to entry.

## III. Conclusion

For all of these reasons, this challenge to a premium sale of a company with the sale proceeds going ratably to all stockholders, recommended by an independent and disinterested board, after an extensive market check, and the tender of shares by a supermajority of stockholders, is dismissed.[113] It is an example of a now too common invocation of the iconic *Revlon* case in a circumstance where the key problem in *Revlon*—board resistance to the highest bidder based on a bias against that bidder—is entirely absent. The *Revlon* doctrine requires a board selling a company to make reasonable efforts to obtain the best price available for the stockholders. Although the dismissal standard is plaintiff-friendly, the pled facts do not come close to providing a rational basis to infer any failure of that kind here.

**112.** Cf. *Lyondell Chemical Co. v. Ryan*, 970 A.2d 235 (Del.2009) (no *Revlon* breach in a sale of control transaction where the board considered one offer for one week, no bidders emerged after the transaction was announced, and the board believed that no other bidders would emerge); *In re Atheros Commc'ns., Inc.*, 2011 WL 864928 (Del.Ch. Mar. 4, 2011) (no likely *Revlon* breach in a process that lasted less than six months where the target board was approached by a strategic buyer, considered strategic alternatives with its financial advisor, talked to two other potential buyers, and signed a merger agreement containing a no shop provision and 3.3% termination fee); *In re MONY Grp. Inc. S'holders Litig.*, 852 A.2d 9 (Del.Ch.2004) (no likely *Revlon* breach where the board limited merger negotiations to one bidder and had a five month, passive, post-signing market check); *In re Pennaco Energy, Inc. S'holders Litig.*, 787 A.2d 691 (Del.Ch.2001) (no likely *Revlon* breach where the board negotiated with a single bidder, and ensured that the transaction was subject to a passive post-signing market check with no preclusive deal

provisions); *In Re Fort Howard Corp. S'holders Litig.*, 1988 WL 83147 (Del.Ch. Aug. 8, 1988) (no likely *Revlon* breach in management buyout where there was no pre-market check and no post-market go shop, but where the special committee negotiated with management and could entertain topping bids in passive post-signing market check).

**113.** The plaintiffs likewise fail to state a claim for aiding and abetting against third-parties Fertitta Morton's Restaurant, Inc., Fertitta Morton's Acquisition, Inc., KeyBanc, and Jefferies, because they have failed to state a conceivable claim for breach of fiduciary duty against any defendant. *See Malpiede v. Townson*, 780 A.2d 1075, 1096 (Del.2001) ("To survive a motion to dismiss, the complaint must allege facts that satisfy the four elements of an aiding and abetting claim: (1) the existence of a fiduciary relationship, (2) *a breach of the fiduciary's duty*, . . . (3) knowing participation in that breach by the defendants, and (4) damages proximately caused by the breach." (citations omitted) (emphasis added)).

The Complaint is DISMISSED WITH PREJUDICE. The parties shall submit an implementing order in five days.