# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

SPARTON CORPORATION, an Ohio Corporation,

Plaintiff,

v.

JOSEPH F. O'NEIL, PETER DUMANIAN, TODD MOUTAFIAN, JASON LEVY, JASON SEIFERT, THOMAS J. YORKEY, WALTER E. GORDON, THOMAS W. PARKER, MARK EVANS, CARMEN GONZALEZ, HAI CAO NGUYEN, BILLY CHEN, HASSAN MALAK, PHILIP J. AGUIAR, THUY THANH THI NGUYEN, CHERYL MARIE PITTMAN-LEWIS, DANIEL T. JACKSON, JOSEPH R. WEEMS, GREGORY A. EDGMON, RICHARD N.C. MICAEL, BEN MCDERMOTT, TY VAN LE, SCOTT A. ZELGEWICZ, JOSEPH P. LOEFFLER, CHRISTOPHER J. ALESSIO, AND IAN GROVER,

Defendants.

JOSEPH F. O'NEIL, in his capacity as Representative of the former Stockholders and Optionholders of Hunter Technology Corporation,

Counterplaintiff,

v.

SPARTON CORPORATION,

Counterdefendant.

) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) )

C.A. No. 12403-VCMR

## MEMORANDUM OPINION

Date Submitted: June 6, 2017
Date Decided: August 9, 2017

Richard M. Beck and Sean M. Brennecke, KLEHR HARRISON HARVEY BRANZBURG LLP, Wilmington, Delaware; Joseph J. Shannon, BODMAN PLC, Detroit, Michigan; *Attorneys for Plaintiff.*

William M. Lafferty, John P. DiTomo, and Zi-Xiang Shen, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; Mark A. Schwartz and Sandra J. Durkin, BUTLER RUBIN SALTARELLI & BOYD LLP, Chicago, Illinois; *Attorneys for Defendants.*

**MONTGOMERY-REEVES, Vice Chancellor.**

This action involves a merger in which Sparton Corporation ("Sparton"), the purchaser, alleges that the merger agreement was fraudulently induced. Sparton argues that Joseph F. O'Neil, the representative of the stockholders and optionholders of Hunter Technology Corporation ("Hunter"), the seller, with the assistance of the other defendants, created and presented false financial statements during the negotiations. Based on these fabricated financials, the parties agreed to a pre-closing estimate of Hunter's working capital, an escrow amount, and a cap on the post-closing adjustment of working capital. Prior to the closing, without Sparton's knowledge, the defendants allegedly wrote down the accounts receivable, returning Hunter's working capital to its correct lower value. After the transaction, Sparton discovered that the working capital actually was much lower than originally thought, and the agreed-upon escrow amount was inadequate to cover the difference. Sparton argues that defendants' fraudulent actions caused millions in damages.

Sparton also asserts a breach of contract claim against the stockholders and optionholders of Hunter, alleging that Hunter's financial statements and accounts receivable did not accurately represent its working capital in breach of the warranties contained in the merger agreement (the "Working Capital Claim"). Additionally, Sparton asserts that O'Neil failed to use commercially reasonable efforts to resolve certain liabilities that Hunter incurred before the transaction in breach of the merger agreement (the "Specific Indemnity Claims"), and the defendants incurred but failed

1

to pay certain invoices, as required under the agreement (the "Expenses Claim"). As a result of the purported fraud and contractual breaches, Sparton alleges it has suffered (1) $1,829,455.00 in damages representing the difference between the inflated working capital it paid for and the working capital that actually existed at closing; (2) unliquidated damages in the amount of fees and costs necessary to resolve the liabilities that O'Neil promised to resolve; and (3) $100,498.70 in damages for the invoices incurred by Hunter for which Sparton now is responsible.

The defendants move to dismiss all claims except the Expenses Claim. The defendants argue that the merger agreement bars both breach of contract claims because the agreement provides exclusive remedies for the purported breaches. Additionally, the defendants contend that Sparton has failed to state a claim for the Specific Indemnity Claims. As to the Working Capital Claim, the agreement's exclusive remedy provision provides a fraud exception; but, the defendants argue that (1) the agreement contains an anti-reliance provision; (2) the defendants did not make any representations to Sparton in the contract regarding the veracity of the financial statements that could form the basis for the fraud claim; and (3) Sparton fails to meet the heightened pleading standard required to state a claim for fraud. For the reasons discussed below, I find that the agreement bars both breach of contract claims and that Sparton has failed to state a claim for fraud. Therefore, the motion to dismiss is granted in its entirety.

## I. BACKGROUND

All facts are drawn from the First Amended Verified Complaint (the "Complaint") and the documents incorporated by reference therein.[1]

### A. Parties and Relevant Non Parties

Plaintiff Sparton Corporation ("Sparton") is a company incorporated in Ohio with its principal place of business in Schaumberg, Illinois. Non-party Hunter Technology Corporation ("Hunter" or the "Company") is a California corporation. Non-party Sparton Hunter Corporation ("Merger Sub") was Sparton's subsidiary formed to effectuate the merger between Hunter and Sparton, with Hunter as the surviving wholly-owned subsidiary of Sparton.

Defendants Joseph F. O'Neil, Peter Dumanian, Todd Moutafian, Jason Levy, and Jason Seifert were stockholders of Hunter before the transaction (collectively, the "Stockholders"). Defendants Thomas J. Yorkey, Walter E. Gordon, Thomas W. Parker, Mark Evans, Carmen Gonzalez, Hai Cao Nguyen, Billy Chen, Hassan Malak, Philip J. Aguiar, Thuy Thanh Thi Nguyen, Cheryl Marie Pittman-Lewis, Daniel T. Jackson, Joseph R. Weems, Gregory A. Edgmon, Richard N.C. Micael, Ben McDermott, Ty Van Le, Scott A. Zelgewicz, Joseph P. Loeffler, Christopher J.

---

[1] *In re Morton's Rest. Gp., Inc. S'holders Litig.*, 74 A.3d 656, 659 n.3 (Del. Ch. 2013). Here, the merger agreement between Hunter Technology Corporation, Sparton Corporation, Sparton Hunter Corporation, and Joseph F. O'Neil is incorporated by reference and attached as Exhibit A to the Complaint (hereinafter, the "Agreement").

3

Alessio, and Ian Grover were optionholders of Hunter before the transaction (collectively, the "Optionholders").

## B. Facts

On April 14, 2015, Sparton, Hunter, Merger Sub, and O'Neil executed a merger agreement through which Sparton acquired Hunter (the "Agreement"). O'Neil negotiated and executed the Agreement as the "representative, agent, proxy, and attorney in fact (coupled with an interest) for all the Stockholders and Optionholders for all purposes under this Agreement . . . ."[2] As a result of the transaction, the Stockholders and Optionholders received $55,000,000.00 in exchange for the cancellation of their shares and outstanding options. The resolution of the pending motion to dismiss requires an examination of certain contractual provisions of the Agreement and, in some instances, the negotiations surrounding those provisions.

### 1. The representations and warranties

Hunter provided the following representations and warranties in Article V of the Agreement:

> The Financial Statements have been based upon the information contained in the Company's and its Subsidiaries' books and records (which are true and complete in all material respects, have been maintained consistently with past practices, and have been made available for inspection by Purchaser or its

---

[2]     Agreement § 13.13(a).

4

representatives), have been prepared in conformity with GAAP, and present fairly in all material respects the financial condition and results of operations of the Company and its Subsidiaries as of the times and for the periods referred to therein. . . .[3]

Except as set forth on the Developments Schedule, since September 30, 2014, there has not been any Material Adverse Change.[4]

Thus, the Company represented that the financial statements were based on the Company's books and records (which were accurate), prepared in accordance with GAAP principles, and "present[ed] fairly in all material respects the financial condition and results of operations of the Company."[5]

The Optionholders and Stockholders agreed to indemnify Sparton for any losses incurred as a result of "any breach of, or any misrepresentation with respect to, any of the representations and warranties expressly and specifically set forth in Article V."[6]  Article V includes the Company's representation regarding the financial statements' accuracy.  But the indemnification provision precludes recovery for any loss "included in the calculation of the final Allocable Amount,"

---

[3]      *Id.* § 5.05.

[4]      *Id.* § 5.06.

[5]      *Id.* § 5.05.

[6]      *Id.* § 11.01.

except in the case of fraud.[7] The "Allocable Amount" includes a calculation to adjust for changes to the Company's working capital.[8]

## 2. The working capital

To account for Hunter's working capital variation over time, the parties agreed that they would use a pre-closing estimate of working capital based on Hunter's March 31, 2015 financial statements and a post-closing working capital adjustment. Section 3.03 of the Agreement provides that at least three business days before closing, "the Company shall prepare and deliver to the Purchaser a good faith estimate of the Allocable Amount based on the Company's books and records and other information then available."[9] As discussed above, working capital is included in the calculation of the Allocable Amount.[10] If within five business days after the final Allocable Amount is determined, the actual Allocable Amount is less than the estimate, then the escrow agent will pay Sparton the amount of the deficiency from the Purchase Price Adjustment Escrow Funds. Any such payments "shall be the sole and exclusive remedy of the Purchaser for any and all claims arising under this

---

[7] *Id.* § 11.01(e).

[8] *Id.* § 1.01.

[9] *Id.* § 3.03(a).

[10] *See supra* Section I.B.1.

6

Agreement with respect to this Section 3.03."[11]  Section 13.14(b) echoes Section 3.03, adding that Sparton "agrees and acknowledges that its right to any payment made pursuant to Section 3.03(h)(i) . . . shall be the Purchaser's sole and exclusive source of recovery for any amounts owing to the Purchaser pursuant to Section 3.03(h)(i), except for claims for Fraud."[12]

On April 10, 2015, Hunter, Sparton, and the Stockholders agreed to the pre-closing estimate of working capital.  Based on this estimate and "O'Neil's representation that any resulting post-closing working capital adjustment would be minimal, and at Defendant O'Neil's insistence,"[13] the parties agreed that the working capital adjustment was capped at $750,000.00 and was the exclusive remedy for any overstatement of the working capital, except in the case of fraud.

Sparton alleges that before the working capital estimate was calculated, O'Neil, with assistance from Alessio, Nguyen, Edgmon, Evans, "and others, made non-GAAP adjustments to Hunter's accounts receivable, thereby artificially overstating the value of Hunter's accounts."[14]  This included "adding amounts to invoices that were not owed to Hunter, including invoicing customers for work that

---

[11]     Agreement § 3.03(h).

[12]     *Id.* § 13.14(b).

[13]     Compl. ¶ 54.

[14]     *Id.* ¶ 55.

7

Hunter had not yet completed and for which it did not yet have the right to payment, and invoicing for obsolete inventory where Hunter had no right or expectation of payment."[15] Sparton contends that between April 10 and April 13, after Sparton had accepted the working capital estimate and agreed to the $750,000.00 escrow amount and cap, but before closing, "Defendants O'Neil, Alessio, Nguyen, Edgmon, Evans, and others purposefully caused Hunter to write off the overstated invoices, reverting Hunter's working capital to its actual, lower value."[16] Sparton alleges that "[m]any of these adjustments were made on Sunday April 12, 2015."[17] Sparton asserts that as a result of this conduct, "Sparton overpaid for Hunter's working capital by $2,579,455.00."[18]

Sparton presented O'Neil with its post-closing working capital adjustment of $2,579,455.00, and O'Neil did not dispute the amount but rather released the entire $750,00.00 working capital escrow amount to Sparton. Sparton then requested an additional $550,000.00 from the indemnity escrow fund to mitigate its working capital damages. O'Neil objected to this request, and the indemnity escrow funds have not been released.

---

[15]     *Id.* ¶ 56.

[16]     *Id.* ¶ 58.

[17]     *Id.*

[18]     *Id.* ¶ 62.

### 3.     The specific indemnity schedule

As part of the Agreement, O'Neil would "have responsibility for managing, handling and controlling the defense, settlement or other disposition of the matters set forth" in the Specific Indemnity Schedule. O'Neil was obligated to "use commercially reasonable efforts to settle on commercially reasonable terms the matters set forth on this Specific Indemnity Schedule within 18 months of the Closing Date."[19] O'Neil also was to "provide Purchaser with information regarding the process of such settlements upon Purchaser's written request."[20] Additionally, "if any matters remain unresolved as of September 1, 2016, at the Purchaser's written request, the Representative and Purchaser shall meet to discuss the planned resolution of such remaining open matters."[21]

The indemnification provision provides the remedy for losses related to "any of the matters set forth on the Specific Indemnity Schedule" if they "are actually incurred prior to October 14, 2016," but it "shall not cover potential Losses from matters that are pending or otherwise have not been resolved prior to October 14, 2016."[22] In other words, the obligation to indemnify Sparton for the matters listed

---

[19]     Agreement Disclosure Schedules, at 60.

[20]     *Id.*

[21]     *Id.*

[22]     *Id.* § 11.01.

9

on the Specific Indemnity Schedule terminates on October 14, 2016 "regardless if any claims are still pending or the matters set forth on the Specific Indemnity Schedule remain pending and have not been settled or otherwise resolved . . . ."[23] A Specific Indemnity Claim only arises once Sparton "actually incurs any out-of-pocket Losses indemnifiable under Section 11.01(iii) of the Merger Agreement or there is a judgment or settlement permitted by the Merger Agreement of any matter covered by Section 11.01(iii) of the Merger Agreement."[24] The Specific Indemnity Claims are Sparton's sole and exclusive remedy for losses related to matters listed on the Specific Indemnity Schedule, except in the case of fraud.[25]

The Specific Indemnity Schedule lists the matters it covers, including (a) the California State Board of Equalization (the "SBOE")'s determination of tax liability in early 2014 of $1,436,968.29 plus accruing interest arising from a company Hunter acquired in 2013; $130,000.00 in sales tax that the acquired company did not report or remit to the SBOE; and certain unrealizable assets prepaid by Hunter, totaling $154,577.00; and (b) the California Department of Toxic Substances Control ("DTSC")'s cleanup claim against 60 parties including Hunter regarding a hazardous waste repackaging facility called Ultra-Chem. The Complaint alleges that Sparton

---

[23] *Id.* § 11.04.

[24] *Id.* Ex. C § 4(e)(vi).

[25] *Id.* § 11.02.

remains liable for both of these unresolved claims due to O'Neil's lack of "commercially reasonable efforts" to resolve them.[26]

### 4. The anti-reliance provision

The Agreement contains an anti-reliance provision that states as follows:

> The representations and warranties of the Company expressly and specifically set forth in Article V (together with any representations and warranties expressly and specifically made by the Stockholders and Optionholders in their respective Letters of Transmittal and Option Cancellation Agreements), as qualified by the Disclosure Schedules, constitute the sole and exclusive representations, warranties, and statements (including by omission) of any kind or nature, whether written or oral, expressed or implied, statutory or otherwise (including, for the avoidance of doubt, relating to quality, quantity, condition, merchantability, fitness for a particular purpose or conformity to samples) of any of the Company, the Stockholders and Optionholders, the Representative or any of their respective Non-Recourse Parties as to any matter concerning the Company, any of its Subsidiaries or any of their respective joint ventures or businesses or in connection with this Agreement or the transactions contemplated by this Agreement, or with respect to the accuracy or completeness of any information provided to (or otherwise acquired by) the Purchaser or the Merger Sub or any of their respective Non-Recourse Parties in connection with this Agreement or the transactions contemplated by this Agreement (including, for the avoidance of doubt, any statements, information, documents, projections, forecasts or other material made available to the Purchaser, the Merger Sub or any of their respective Non-Recourse Parties in certain "data rooms" or presentations including "management presentations") and all other purported representations and warranties or

---

[26]    *Id.* Disclosure Schedules, at 60.

11

statements (including by omission) are hereby disclaimed by the Company, the Stockholders and Optionholders, the Representative and each of their respective Non-Recourse Parties and none of the Purchaser or the Merger Sub or any of their respective Non-Recourse Parties shall have any claim with respect to their purported use of, or reliance on, any such representations, warranties or statements (including by omission). The Purchaser and the Merger Sub are otherwise acquiring the Company, its Subsidiaries, its joint ventures and their respective businesses on an "AS IS, WHERE IS" basis.[27]

Thus, Sparton agreed that it did not rely on anything outside the representations and warranties contained in the Agreement in executing the Agreement.

## C. Procedural History

Sparton filed its original complaint in this action on June 2, 2016. On July 22, 2016, the Defendants filed their answer, counterclaims, and partial motion to dismiss. On August 11, 2016, Sparton answered the Defendants' counterclaims. On September 14, 2016, Sparton filed the Complaint. On October 14, 2016, the Defendants filed their answer, amended and supplemental counterclaims, and partial motion to dismiss the Complaint. On November 7, 2016, Sparton filed its answer to the amended and supplemental counterclaims. On June 6, 2017, this Court held oral argument on the partial motion to dismiss the Complaint.

---

[27] *Id.* § 10.01.

12

## II.   ANALYSIS

### A.   Standard of Review

The Defendants move to dismiss for failure to state a claim under Court of Chancery Rule 12(b)(6). For the purposes of a motion to dismiss under Rule 12(b)(6),

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are "well-pleaded" if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and (iv) dismissal is inappropriate unless the "plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof."[28]

While I must draw all reasonable inferences in the plaintiff's favor, I need not "accept as true conclusory allegations 'without specific supporting factual allegations.'"[29]

### B.   Sparton Fails to State a Claim for Breach of Contract

In order to allege a breach of contract, a plaintiff must show the existence of a contract, a breach of the contractual obligations, and damages to the plaintiff as a

---

[28] *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 168 (Del. 2006) (quoting *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896-97 (Del. 2002)).

[29] *Id.* (quoting *In re Santa Fe Pac. Corp. S'holder Litig.*, 669 A.2d 59, 65-66 (Del. 1995)).

result of the breach.[30] Sparton alleges that the Defendants breached the contractual provisions relating to the Specific Indemnity Schedule and the working capital estimate.

Under the Agreement, the sole and exclusive remedy for losses relating to the matters set forth in the Specific Indemnity Schedule are claims against the indemnity escrow fund; but that indemnification obligation ended on October 14, 2016 "regardless if any claims are still pending or the matters set forth on the Specific Indemnity Schedule remain pending and have not been settled or otherwise resolved . . . ."[31] Additionally, a Specific Indemnity Escrow Claim does not arise until Sparton actually incurs out-of-pocket losses, a judgment is issued, or settlement is reached.[32]

Sparton argues that it should be "excused from complying with the dispute procedures" set out in the Agreement because "Defendants' conduct has made exact conformance to the Merger Agreement impossible."[33] The sum total of Sparton's allegations in the Complaint are that O'Neil "failed to make commercially reasonable efforts" to resolve Hunter's liabilities because they were not resolved by

---

[30]     *Osram Sylvania Inc. v. Townsend Ventures, LLC*, 2013 WL 6199554, at \*6 (Del. Ch. Nov. 19, 2013) (citing *Bakerman v. Sidney Frank Imp. Co.*, 2006 WL 3927242, at \*19 (Del. Ch. Oct. 10, 2006)).

[31]     Agreement §§ 11.01; 11.02; 11.04.

[32]     *Id.* Ex. C § 4(e)(vi).

[33]     Pl.'s Opp'n Br. 17.

14

October 14, 2016, and "[a]s a result, Sparton remains liable for unresolved claims originally asserted against Hunter which Defendant O'Neil should have, and could have, resolved using commercially reasonable efforts."[34]  The Complaint provides no details about how O'Neil did not meet this requirement or why "Defendants' conduct has made exact conformance to the Merger Agreement impossible."[35]  The conclusory allegation that O'Neil did not use commercially reasonable efforts to resolve the matters because the matters remain unresolved is not enough to state a claim under Rule 12(b)(6).[36]  Therefore, this claim is dismissed.

With regard to the Working Capital Claim, the Agreement in Section 3.03(h)(i)(A) provides that if the Allocable Amount determined after closing is less than the Estimated Allocable Amount, the buyer and the representative shall "cause the Escrow Agent to: (A) pay to the Purchaser from the Purchase Price Adjustment

---

[34]   Compl. ¶¶ 78, 81, 103, 104, 105.

[35]   Pl.'s Opp'n Br. 17.

[36]   Sparton alleges facts in its briefing on this motion that do not appear in the Complaint.  But Sparton offers no explanation for its attempt to amend the Complaint through its brief.  "When defendants filed their motions to dismiss [Plaintiff] had a choice to make under Court of Chancery Rule 15(aaa). It could either seek leave to amend its complaint or stand on its complaint and answer the motion to dismiss.  Having chosen the latter course of action, it is bound to the factual allegations contained in its complaint. It cannot supplement the complaint through its brief."  *MCG Capital Corp. v. Maginn*, 2010 WL 1782271, at *5 (Del. Ch. May 5, 2010).

15

Escrow Funds an amount . . . equal to such deficiency."[37]  The Agreement further provides that the "payments described in Section 3.03(h)(i) shall be the sole and exclusive remedy of the Purchaser for any and all claims arising under this Agreement with respect to this Section 3.03."[38]  Section 13.14 adds that Sparton agrees that the "sole and exclusive source of recovery for any amounts" owed under Section 3.03(h)(i) is its right to payment under that section, "except for claims for Fraud."[39]  Additionally, except in the case of fraud, any loss attributable to amounts included in the calculation of the final Allocable Amount, which includes working capital, cannot be recovered from the indemnity escrow fund.[40]

Sparton does not dispute the applicability of these contractual terms and admits that it has received the full $750,000.00 from the Purchase Price Adjustment Escrow Fund.  Sparton argues that this claim should survive the motion to dismiss because the contract was fraudulently induced, and therefore, any contractual limitations do not apply.  This claim, thus, rises and falls with the fraud claim, which

---

[37]     Agreement § 3.03(h)(i)(A).

[38]     *Id.* § 3.03(h).

[39]     *Id.* § 13.14(b).

[40]     *Id.* § 11.01(e).

16

I discuss below. As I find that Sparton has not adequately alleged a claim for fraud, this claim also is dismissed.[41]

### C. Sparton Fails to State a Claim for Fraud

In order to state a claim for fraud, a plaintiff must allege that (1) the defendants made a false representation or omission of fact that they had a duty to disclose; (2) the defendants knew or believed that the representation was false or made the representation with reckless indifference to the truth; (3) the defendants intended to induce the plaintiff to act or refrain from acting; (4) the plaintiff acted or did not act in justifiable reliance on the representation; and (5) the plaintiff suffered damages as a result of the reliance.[42]

Court of Chancery Rule 9(b) requires that "the circumstances constituting fraud [] shall be stated with particularity," while "[m]alice, intent, knowledge and other condition of mind of a person may be averred generally."[43] "To satisfy Rule 9(b), a complaint must allege: (1) the time, place, and contents of the false

---

[41]     *See infra* Section II.C.

[42]     *Addy v. Piedmonte*, 2009 WL 707641, at *18 (Del. Ch. Mar. 18, 2009); *Abry P'rs V, L.P. v. F & W Acquisition LLC*, 891 A.2d 1032, 1050 (Del. Ch. 2006).

[43]     Ct. Ch. R. 9(b); *Addy*, 2009 WL 707641, at *19; *Abry*, 891 A.2d at 1050.

representation; (2) the identity of the person making the representation; and (3) what the person intended to gain by making the representations."[44]

### 1. Sparton cannot rely on extra-contractual representations

The Agreement contains an anti-reliance provision. In Delaware, "[w]e have honored clauses in which contracted parties have disclaimed reliance on extra-contractual representations, which prohibits the promising party from reneging on its promise by premising a fraudulent inducement claim on statements of fact it had previously said were neither made to it nor had an effect on it."[45] Here, Section 10.01 provides that

> the representations and warranties of the Company expressly and specifically set forth in Article V (together with any representations and warranties expressly and specifically made by the Stockholders and Optionholders in their respective Letters of Transmittal and Option Cancellation Agreements), as qualified by the Disclosure Schedules, constitute the sole and exclusive representations, warranties and statements (including by omission) of any kind or nature . . . of any of the Company, the Stockholders and Optionholders, the Representative or any of their respective Non-Recourse Parties.[46]

---

[44]  *Abry*, 891 A.2d at 1050 (citing *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 145 (Del. Ch. 2003)); *see Addy*, 2009 WL 707641, at *19.

[45]  *Abry*, 891 A.2d at 1056.

[46]  Agreement § 10.01.

18

Thus, Sparton may only rely on "representations, warranties and statements" included in the Agreement and in the attached documents. Sparton cannot rely on representations made by O'Neil or anyone else before the transaction.

### 2. The indemnification limitations do not apply in cases of fraud

Sparton points to the financial statements attached to the Agreement and argues that the Company falsely represented that the financial statements were based on the Company's books and records, which are true and complete, prepared in conformity with GAAP, and "present[ed] fairly in all material respects the financial condition and results of operations of the Company and its subsidiaries as of the times and for the periods referred to therein . . . ."[47]

Although the Company, not the Stockholders or Optionholders, made the pertinent representations in Article V,[48] the Stockholders and Optionholders agreed to indemnify Sparton for any "breach of, or any misrepresentation with respect to, any of the representations and warranties expressly and specifically set forth in Article V."[49] As discussed above, this provision contains a carve-out for any losses stemming from amounts included in the calculation of the Allocable Amount, which

---

[47] *Id.* § 5.05.

[48] *Id.* § 5.05 (emphasis added).

[49] *Id.* § 11.01.

includes working capital, but the limitation does not apply in the case of fraud.[50]

Therefore, I must determine whether Sparton has adequately alleged a claim for fraud.

### 3. Sparton's fraud claims fail

Sparton's allegations do not meet the heightened pleading standard required to show fraud. Sparton alleges that O'Neil negotiated the Agreement on behalf of the Stockholders and Optionholders. This included establishing the working capital estimate that was based on the inflated accounts receivable in the financial statements. Sparton alleges that O'Neil "fraudulently overstated Hunter's accounts receivable with assistance from Defendants Alessio, Nguyen, Edgmon, Evans, and others."[51] This allegedly was done by making non-GAAP adjustments to the accounts receivable through the addition of amounts to invoices that were not owed to Hunter, including for work Hunter had not yet completed, for which Hunter had no expectation of payment, or for obsolete inventory.[52] Sparton asserts that "alternately," Defendants O'Neil, Alessio, Nguyen, Edgmon, Evans, "and others"

---

[50] Agreement §§ 11.01(e), 1.01; *see supra* Section II.B; *Abry*, 891 A.2d at 1061-64.

[51] Compl. ¶ 121.

[52] *Id.* ¶ 56.

wrote down "existing accounts receivable in non-GAAP transactions after their full value had already been included in Hunter's Working Capital Estimate."[53]

These Defendants, the Complaint asserts, had an "express intent" to inflate the value of Hunter's assets to artificially increase the amount of the working capital estimate. Further, O'Neil represented that a working capital escrow of $750,000.00 would cover any post-closing working capital adjustment and provided Sparton with Hunter's March 31, 2015 financial statements, which Sparton purportedly reasonably relied on in executing the merger. After Sparton had agreed to the estimate and the escrow amount, but before closing, Sparton asserts that the same Defendants "purposefully caused Hunter to write off the overstated invoices, reverting Hunter's working capital to its actual lower value."[54] Thus, Sparton alleges, it grossly overpaid for Hunter's working capital by millions of dollars, and O'Neil ensured that Sparton would only be able to recover $750,000.00 under the Agreement.

Sparton alleges that the Stockholders and Optionholders knew that Sparton would rely on O'Neil's representations to Sparton on behalf of Hunter, ratified O'Neil's fraudulent acts by accepting the merger consideration, and personally

[53]     *Id.*

[54]     *Id.* ¶ 58.

21

benefitted from O'Neil's fraudulent misrepresentations. Thus, Sparton argues, they are liable for the fraud O'Neil purportedly committed in his capacity as their representative.

First, in order for the fraud claim to survive the motion to dismiss, Sparton is "required to identify specific acts of individual defendants"[55] and to "identify who made any particular misrepresentation and to whom they were made."[56] Sparton lists the names of certain Defendants "and others" and states that they "assisted" O'Neil but does not identify who specifically did what or how they "assisted" in allegedly misstating the invoices or financial statements. And in its briefing, Sparton acknowledges that it cannot "yet identify the specific roles of the co-conspirators."[57] These allegations fail to satisfy Rule 9(b).

Second, as to the details regarding the purported fraud, the Complaint alleges that this group of Defendants "fraudulently overstated Hunter's accounts receivable" by "adding amounts to invoices that were not owed to Hunter."[58] Sparton contends that this group then "caused Hunter to write off the overstated invoices, reverting

---

[55] *Fortis Advisors LLC v. Dialog Semiconductor PLC*, 2015 WL 401371, at *8 n.48 (Del. Ch. Jan. 30, 2015) (quoting *Steinman v. Levine*, 2002 WL 31761262, at *15 (Del. Ch. Nov. 27, 2002)).

[56] *Id.* at *8.

[57] Pl.'s Opp'n Br. 20.

[58] Compl. ¶¶ 56, 121.

Hunter's working capital to its actual, lower value."[59] Sparton does not identify the invoices or the amount by which they were doctored. Also, Sparton does not allege if these invoices were falsely created before or after the deal was negotiated. This information is relevant here because evidence showing that the invoices were created before the deal was negotiated would undercut Sparton's theory that the invoices were falsely created to boost the Company's financials for the sale.

Third, although knowledge may be alleged generally under Rule 9(b), if Sparton is alleging that the Defendants knew of the purported fraud, "it must allege sufficient facts from which it can reasonably be inferred that this 'something' was knowable and that the defendants were in a position to know it."[60] Sparton points to *Osram Sylvania Inc. v. Townsend Ventures, LLC*[61] as an example of a case that satisfies the pleading requirement. In *Osram*, the named defendants negotiated and personally entered into the stock purchase agreement. They also severally represented that the financial statements were "correct and complete in all material respects," "prepared in accordance with the books and records" of the acquired companies, and prepared "in accordance with GAAP."[62]

---

[59]     *Id.* ¶ 58.

[60]     *Abry P'rs V, L.P. v. F & W Acquisition LLC*, 891 A.2d 1032, 1050 (Del. Ch. 2006).

[61]     2013 WL 6199554, at *1 (Del. Ch. Nov. 19, 2013).

[62]     Compl. Ex. A, at 26, 29, *Osram*, C.A. No. 8123-VCP (Del. Ch. Dec. 19, 2012).

23

After closing, the plaintiff conducted an investigation and found that the individual defendants (1) had altered the size and nature of the company's business segments on the company's financials before closing, (2) knew before closing that two salespeople who accounted for 32% of the company's sales forecast had resigned, and (3) knew that the company had significant liabilities that it did not disclose or otherwise account for in its financial statements.[63] The investigation also uncovered that the individual defendants were privy to internal e-mails sent immediately before the closing. The emails discussed the company's "cash problem" if the deal did not close imminently and suggested that the individual defendants buy the company's product in order to strengthen the company's revenue numbers during negotiations.[64] The Court in *Osram* noted that "a mere allegation that a defendant 'knew or should have known' about a false statement is not sufficient to plead the requisite state of mind."[65] But in that case, the e-mails "support[ed] an inference that Sellers falsely were trying to bolster the financial

---

[63]     *Osram*, 2013 WL 6199554, at *3.

[64]     *Id.*; Compl. ¶ 48(j), *Osram*, C.A. No. 8123-VCP (Del. Ch. Dec. 19, 2012).

[65]     *Osram*, 2013 WL 6199554, at *14 (citing *Stuchen v. Duty Free Int'l Inc.*, 1996 WL 33167249, at *5 (Del. Super. Apr. 22, 1996)).

condition of the Company" and "were knowing participants in an effort to defraud OSI."[66]

Here, in an attempt to satisfy the knowledge requirement, Sparton alleges that O'Neil was involved in the negotiations, and "it would make little sense to imply" that O'Neil, as representative of the Stockholders and Optionholders, "would not have knowledge of the financials of the company whose interest he purports to represent."[67] Sparton also argues that "as Stockholders and Optionholders in the Company," the Defendants "are charged with the knowledge held by their Representative in the transaction."[68] But, as discussed above, none of the Stockholders or Optionholders personally represented anything as to the accuracy of the financial statements, signaling they were not in a position to know the veracity of the statements. Further, Sparton does not plead any particularized facts about Defendants' roles in the Company or any of Defendants' relationships with management, other than that they are Stockholders and Optionholders and that O'Neil is the Representative of the Stockholders and Optionholders. And Sparton fails to allege any other facts to show that any of the Defendants had the authority to prepare either the invoices or the financial statements or that they would be in a

---

[66]    *Id.*

[67]    Pl.'s Opp'n Br. 20.

[68]    *Id.*

position to know that these documents were falsely prepared.[69] Thus, the Complaint does not allege that Defendants knew that the invoices or financial statements were overstated or improperly recorded. As a result, Sparton fails to allege a claim for fraud.

## III.    CONCLUSION

For the foregoing reasons, I grant Defendants' motion to dismiss in its entirety. All of Sparton's claims, except the Expenses Claim, are dismissed.

**IT IS SO ORDERED**.

---

[69]    Counsel for Sparton noted at oral argument that Spartan chose "not to conduct informal discovery on [its] own company at this point" to discover any of these facts. Oral Arg. Tr. 36.