# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| JIM GILBERT and BARRETT O'DONNELL, Individually and On Behalf of All Others Similarly Situated, | ) ) ) | |
| | ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 2018-0453-SG |
| | ) | |
| | ) | |
| EZRA PERLMAN, DAVID A. JONES, JR., FRANCISCO PARTNERS IV, L.P., FRANCISCO PARTNERS IV-A, L.P., FP HEALTHCARE HOLDINGS, INC., FP HEALTHCARE MERGER SUB CORPORATION, and CHRYSALIS VENTURES II, L.P., | ) ) ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Date Submitted: January 23, 2020
Date Decided: April 29, 2020

Seth D. Rigrodsky, Brian D. Long, and Gina M Serra, of RIGRODSKY & LONG, P.A., Wilmington, Delaware; OF COUNSEL: Richard A. Maniskas, of RM LAW, P.C., Berwyn, Pennsylvania, *Attorneys for Plaintiffs*.

Rudolf Koch, of RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; OF COUNSEL: Deborah S. Birnbach and Morgan R. Mordecai, of GOODWIN PROCTER LLP, *Attorneys for Defendants*.

GLASSCOCK, Vice Chancellor

Fiduciaries are those who have ownership or control of property belonging, equitably, to others.  These legal-versus-beneficial interests notably create agency problems, and require that fiduciaries be bound by certain duties, imposed in equity, to remain faithful to those to whom these duties run; in the corporate context, the entity they serve and its owners, the stockholders.  Typically, corporate fiduciaries—directors and officers—accept their duties explicitly, in that they agree to undertake the roles in which those duties arise.  Identifying them as fiduciaries, therefore, is straightforward.

Corporate controllers are stockholders who, through control of the majority of the voting shares (or otherwise) can seize the corporate machinery and turn it to their own benefit.  When they do so, they control the entity; the property, in part, of the minority stockholders.  In that sense, when they employ that control they too are fiduciaries.  Unlike with directors and officers, however, controlling stockholders have duties imposed upon them.  They are not volunteers.  Moreover, like other stockholders, they are also the beneficiaries of the traditional fiduciary duties owed stockholders, and like other stockholders they may vote their stock, and take other actions with respect to the entity, in their own self-interest free of fiduciary strictures, so long as they do not employ the corporate machinery itself.  This incomplete disquisition is by way of saying that the extent of the application of fiduciary duties

upon stockholders alleged to have acted as controllers does not always lend itself to a straightforward analysis.

The instant matter involves a controlled entity, Connecture, Inc. ("Connecture" or the "Company"), taken private in a cash-out merger with its majority stockholder, Defendant Francisco Partners.[1] According to the Plaintiff stockholders, the merger price and process were unfair. Francisco Partners, a corporate controller, stood on both sides of the transaction, and entire fairness is the standard of review that Francisco Partners must satisfy here.[2]

Two minority stockholders, Defendants Chrysalis Ventures II, L.P. ("Chrysalis") and an individual, David A. Jones, Jr., agreed with Francisco Partners to roll over their interest in Connecture as part of the merger. The Plaintiffs allege that Chrysalis and Jones were a part of a control group with Francisco Partners, and are thus also controllers and charged with fiduciary duties as well. Chrysalis and Jones have moved to dismiss under Rule 12(b)(6), maintaining that they were not acting as corporate fiduciaries in deciding to roll over their interests, but simply stockholders acting in their own interests. For reasons laid out below, I determine that Chrysalis and Jones did not constitute a "control group" with Francisco Partners, which, I note again, had voting control of Connecture without the help of Chrysalis

---

[1] Francisco Partners, as described below, is a shorthand term for a group of related parties.

[2] Absent a defense under which it may shift or ameliorate this burden.

or Jones. Accordingly, neither Chrysalis nor Jones owed fiduciary duties to the minority on that basis, and Chrysalis and Jones' Motion to Dismiss Count I of the Complaint must be granted. In addition, the Plaintiffs allege that Jones, a director of Connecture, breached his duty of loyalty in that role as well. Jones has moved to dismiss that claim; I find that consideration of that motion may benefit from supplemental briefing, and I therefore defer consideration of that portion of his Motion to Dismiss.

My reasoning is below.

## I. BACKGROUND[3]

*A. The Parties*

Non-party Connecture is a Delaware corporation headquartered in Brookfield, Wisconsin.[4] Connecture provides "web-based information systems used to create health insurance marketplaces."[5]

Plaintiffs Jim Gilbert and Barrett O'Donnell were at all relevant times prior to the going-private transaction owners of Connecture common stock.[6]

---

[3] I draw all facts from the Plaintiff's Verified Class Action Compl., Docket Item ("D.I.") 1 ("Compl.") and documents incorporated therein. *See in re Morton's Rest. Grp., Inc. S'holder Litig.*, 74 A.3d 656, 658–59 (Del. Ch. 2013) (permitting consideration of documents incorporated into complaint in motion to dismiss). As discussed further below, all well-pled facts are considered true for the sake of this motion.

[4] Compl., ¶ 19.

[5] *Id.*

[6] *Id.* ¶¶ 9–10.

Defendants Francisco Partners IV, L.P. and Francisco Partners IV-A, L.P. (the "FP Investors") are Cayman Islands exempted limited partnerships based in San Francisco.[7] The FP Investors were parties to the transactions at issue.[8] The FP Investors are controlled by a general partner, Francisco Partners GP IV, L.P., also a Cayman Islands exempted limited partnership.[9] Francisco Partners GP IV, L.P. is, in turn, controlled by its general partner, Francisco Partners GP IV Management Limited, a Cayman Islands exempted company.[10] I refer to these entities collectively as "Francisco Partners."

Defendants FP Healthcare Holdings, Inc. and FP Healthcare Merger Sub Corporation (collectively "FP Healthcare") are Delaware corporations controlled by FP Investors and created for the purposes of the transaction.[11]

Defendant Ezra Perlman served on the Connecture board of directors (the "Board") since 2016 as Francisco Partners' designee.[12] Perlman is co-president of Francisco Partners.[13]

---

[7] *Id.* ¶ 11.

[8] *Id.*

[9] *Id.*

[10] *Id.*

[11] *Id.* ¶¶ 2, 12.

[12] *Id.* ¶ 13.

[13] *Id.*

Defendant Chrysalis is a Delaware limited partnership headquartered in Kentucky.[14] It is a private investment partnership controlled by its general partner, Chrysalis Partners II, LLC, a Delaware limited liability company.[15]

Defendant Jones served as Chairman of the Connecture Board since 2011.[16] Jones "is an affiliate of, and has a financial interest in, Chrysalis."[17] Jones serves on an investment committee of Chrysalis' general partner Chrysalis Partners II, LLC.[18] That committee makes "[i]nvestment and voting decisions with respect to the shares held by Chrysalis."[19]

Non-parties A. John Ansay, Vickie Capps, Paul Kusserow, Kraig McEwen, Jeffery Surges, and Russel Thomas were directors on Connecture's Board.[20]

*B. Factual Background*

1. FP Investors and Chrysalis Acquire a Stake in Connecture

Connecture was established in 1999.[21] It is an online health insurance marketplace that connects health insurance consumers with providers.[22] In

---

[14] *Id.* ¶¶ 1, 15.

[15] *Id.* ¶ 15.

[16] *Id.* ¶ 16.

[17] *Id.*

[18] *Id.* ¶ 15.

[19] *Id.*

[20] *Id.* ¶¶ 20–25.

[21] *Id.* ¶ 33.

[22] *Id.* ¶ 34.

November 2015, the Board sought to raise capital through a private placement offering.[23] In response, in February 2016, Francisco Partners made an offer to purchase securities through this private placement.[24] The Board formed a committee (the "First Committee"), and the First Committee and the Board approved the offer at a February 19 board meeting.[25] At this board meeting, Defendant Jones informed the Board that Chrysalis wished to participate in the offering as well.[26] Pursuant to this private placement offering, on March 11, 2016, FP Investors and Chrysalis purchased $52 million of newly created Series A Preferred Stock.[27] On an as-converted basis, the Series A Preferred Stock represented 34% ownership of the Company.[28] After the financing closed, FP Investors began purchasing shares on the market, and by December 31, 2016, it beneficially owned 43% of the Company on an as-converted basis.[29]

---

[23] *Id.* ¶ 35.

[24] *Id.*

[25] *Id.*

[26] *Id.* ¶ 36. As noted, Jones was an affiliate of Chrysalis, which owned just over 18% of Connecture common stock. *Id.*

[27] *Id.* ¶ 37. The Preferred Stock had a stated value of $1,000 per share and a conversion price into common stock of $4.50, convertible into the number of common stock equal to the stated value. *Id.* The Preferred stock earned dividends of 7.5% annually. *Id.* Under an investor rights agreement that was part of the financing deal, Francisco Partners gained the right to designate a member of the Board. *Id.* ¶ 38. It designated Perlman. *Id.*

[28] *Id.* ¶ 38.

[29] *Id.* ¶ 40.

In January 2017, the Company decided to conduct another round of financing.[30] It created another special committee (the "Second Committee").[31] Francisco Partners submitted an offer, and this offer also contemplated an additional investment by Chrysalis.[32] On March 7, 2017, FP Investors and Chrysalis purchased $17.5 million of Series B Preferred Stock.[33] The Board also increased its size by one seat, and FP Investors designated the additional seat.[34] When the second round of financing closed, on an as-converted basis, FP Investors owned 56% of the Company, and Chrysalis owned 11%.[35]

The Company's 10-K, dated March 31, 2017, recognized the influence several of the Defendants had gained over the Company:

> Collectively, as of March 10, 2017, our directors, executive officers, and their affiliated entities beneficially owned approximately 68% of our outstanding capital stock . . . if they act together, [they] could exert substantial influence over matters requiring approval by our stockholders . . . which may further discourage, delay or prevent a third party from making a significant equity investment in us, or could discourage, delay, or prevent transactions involving a change in control,

---

[30] *Id.* ¶ 41.

[31] *Id.*

[32] *Id.*

[33] *Id.* ¶ 42. The Series B Preferred Stock had a conversion price of $1.91 and annual dividends of 15%. *Id.* Under this second round of financing, FP Investors contracted for Board designation rights proportionate to its ownership percentage of the Company on an as-converted basis. *Id.* ¶ 43. The Complaint states this designation right was "rounded up to the nearest whole director." *Id.*

[34] *Id.* ¶ 43.

[35] *Id.*

including transactions in which our stockholders might otherwise receive a premium for their shares over the then-current market price.[36]

### 2. The Company Receives a Solicitation

In May 2017, a strategic party ("Party A") offered to acquire a portion of Connecture's business.[37] When the Board rejected the proposal, Party A entered a confidentiality agreement with the Company to investigate an interest in acquiring the entire Company.[38] In July 2017, Party A offered to buy the entire Company in cash for $1 to $2 per share.[39] The Board constituted a special committee (the "Third Committee") to review the offer and other strategic alternatives.[40]

In August 2017, the Third Committee's financial advisor presented possible strategic and financial alternatives to the Board, and, at the Board's direction, contacted these potential acquirers.[41] This resulted in interest from seven potential acquirers, who entered into confidentiality agreements with the Company.[42] Ultimately, none submitted an indication of interest.[43] The financial advisor also

---

[36] *Id.* ¶ 61.

[37] *Id.* ¶ 46.

[38] *Id.*

[39] *Id.* ¶ 47.

[40] *Id.* The Complaint states that the Third Committee was not authorized to select its own financial advisor. *Id.*

[41] *Id.* ¶ 48.

[42] *Id.*

[43] *Id.*

8

contacted Francisco Partners and Chrysalis, but they expressed no interest in acquiring the Company at that time.[44]  In late August, Party A withdrew its proposal.[45]

### 3. The Company Delists its Shares on NASDAQ and FP Investors Makes an Offer

Around the time the second financing offer closed, NASDAQ had informed the Company that it was out of compliance with two listing requirements.[46]  The Company faced delisting if it did not comply with these listing requirements by October 31, 2017 and November 27, 2017, respectively.[47]  With the first deadline approaching, on October 17, the Board decided to delist the Company.[48]  Connecture common stock ceased trading on NASDAQ on October 30, 2017, and began trading the next day on the OTCQX US Market.[49]  At the time the Board decided to delist, Connecture stock traded at $0.60 per share; within two weeks—by November 1—it had dropped to $0.17 per share.[50]

---

[44] *Id.* ¶¶ 48–49.

[45] *Id.* ¶ 50.

[46] *Id.* ¶ 51.  The Company was not maintaining NASDAQ's minimum $15 million market value and $1 per share requirements.  *Id.*

[47] *Id.*

[48] *Id.*

[49] *Id.*

[50] *Id.*

On November 13, 2017, FP Investors made an offer on behalf of the Defendants to acquire all the Company's outstanding stock for $0.30 per share (the "Transaction").[51] The Complaint alleges that "[i]n accordance with their earlier, agreed to plan, FP Investors' proposal assumed that all of the Company's outstanding preferred stock (including Chrysalis' preferred stock) would be rolled over into a newly formed acquisition vehicle."[52] This offer was not conditioned on the approval of a majority of the minority stockholders or the approval of an independent special committee.[53]

### 4. A New Special Committee Negotiates and Approves the Transaction

After the offer from FP Investors, the Third Committee received notice of possible conflicts for its financial and legal advisors, so it retained new legal counsel and a new financial advisor.[54] However, its former legal and financial advisors remained heavily involved, attending meetings, negotiating, and managing certain portions of the transaction process.[55] At the end of November, the Board met, reviewed the offer, and constituted a new special committee to continue negotiations

---

[51] *Id.* ¶ 52.

[52] *Id.*

[53] *Id.* ¶ 53. Nothing in the Proxy indicates that either the Third or Fourth Committees requested or attempted to negotiate for this provision. *Id.* ¶ 94.

[54] *Id.* ¶¶ 54–56.

[55] *Id.*

(the "Fourth Committee").[56] The Fourth Committee engaged the same legal and financial advisors as the Third Committee.[57]

In early December 2017, Francisco Partners declined to consider a financing alternative to its share buyout proposal.[58] The Fourth Committee met with its financial advisor, Houlihan Lokey, Inc. ("Houlihan Lokey"), on December 15, and discussed tax issues, including the Company's net operating losses that were likely to make its effective tax rate 0%.[59] According to the 14D-9, Houlihan Lokey also discussed at that meeting the "importance of Chrysalis' support for the Proposed Transaction given its ownership of approximately 11% of the Company's outstanding capital stock and the importance of Chrysalis and Francisco Partners agreeing on the terms of the rollover of Chrysalis' Preferred Stock into the acquiring entity."[60] The Fourth Committee decided on a counteroffer of $0.52 per share, but when it made the proposal later that week, Francisco Partners refused.[61]

---

[56] *Id.* ¶ 57. The Complaint alleges that each member of the Fourth Committee lacked independence from the proposed acquirers. *Id.* ¶¶ 58–59.

[57] *Id.* ¶ 59.

[58] *Id.* ¶ 60.

[59] *Id.* ¶ 62.

[60] *Id.* ¶ 63.

[61] *Id.* ¶ 64.

On December 17 and 18, the Fourth Committee discussed potential acquirers for the sake of a pre-signing market check or a post-signing go-shop period.[62] The Fourth Committee ultimately decided to forego a pre-signing market check in exchange for an extended post-signing go shop period.[63]

On December 22, according to the 14D-9, Chrysalis communicated to the Fourth Committee that it "would be willing to consider including its shares of Common Stock in the rollover" if doing so would "help the [Fourth Committee] negotiate a higher price for the Non-Rolling Stockholders."[64] The Fourth Committee and Francisco Partners both agreed.[65] On December 29, Francisco Partners agreed to a one-time increase of its offer from $0.30 to $0.35 per share.[66] The Fourth Committee did not use the Company's net operating losses (potentially worth an

---

[62] *Id.* ¶ 65.

[63] *Id.*

[64] *Id.* ¶ 66.

[65] *Id.*

[66] *Id.* ¶ 67. The Plaintiffs, in the Complaint, make a somewhat confusing allegation: they contend that now that Chrysalis was rolling over its common stock, Francisco Partners ought to have "disburse[d] this consideration to Connecture's minority stockholders." *Id.* ¶¶ 67, 101. Thus, the Complaint concludes that because Chrysalis' shares were worth $1,202,148.60 at $0.30 per share, and the $0.05 offer increase only increased the total capital going to minority shareholders by $780,753.70, this meant Francisco Partners was *reducing* its aggregate purchase price for all outstanding shares and that it therefore "shortchanged" the minority stockholders out of $420,000 by *increasing* its offer, despite the resulting increase in value to the Plaintiffs' purported class. *Id.* I did not find this the most pellucid theory, either in the Complaint or at oral argument.

aggregate $199 million) as a negotiating tool.[67]  Instead, the Fourth Committee

decided to accept the offer that same day.[68]  A few days later, two Chrysalis members

who owned Connecture common stock—one of them Chairman of the Board

Jones—asked to participate in the equity rollover, and Francisco Partners agreed.[69]

On January 4, 2018, the Fourth Committee met to review the transaction.[70]

The Complaint alleges that in delivering its fairness opinion, Houlihan Lokey used

several "objectively improper assumptions and adjustments" to drive down the

perceived value of the Company.[71]  The Fourth Committee recommended the

Transaction, and the Board approved the merger agreement (the "Merger

Agreement") the same day.[72]

### 5. The Minority Stockholders Vote Against the Transaction

Another financial advisor contacted third parties following execution of the

Merger Agreement, but no higher bidders emerged.[73]  FP Investors and Chrysalis

---

[67] *Id.* ¶ 68.  The Complaint alleges that these net operating losses could be used against future projected earnings, although earnings appeared to have been negative at the time of the negotiations.  *See id.* ¶¶ 69, 104.

[68] *Id.* ¶ 70.

[69] *Id.* ¶ 71.

[70] *Id.* ¶ 72.

[71] *Id.* ¶¶ 73–76. Specifically, the Complaint alleges that Houlihan Lokey failed to account for the value of future anticipated cash flows, the value of the net operating losses, the proper companies for its selected company analysis, and the wrong revenue multiples.  *Id.*

[72] *Id.* ¶ 77.

[73] *Id.* ¶ 78.

entered a voting agreement (the "Voting Agreement") with the Company that committed them to vote their shares—representing approximately 68% of the Company's stock—in favor of the Transaction.[74] On April 24, 2018, the Transaction received an underwhelming 9.9% approval from the Company's unaffiliated minority stockholders.[75] The merger took place on April 25, 2018.[76] According to the Proxy, under Securities and Exchange Commission (SEC) rules, all the Defendants in this Action are defined as "Purchaser Filing Parties."[77] Because of this status, each was "required to express its position as to the fairness of the proposed Merger to the Company's unaffiliated security holders."[78]

*C. Procedural History*

The Plaintiffs filed their class action complaint (the "Complaint") on June 25, 2018.[79] Defendants Perlman and Francisco Partners answered the Complaint on October 19, 2018.[80] Defendants Jones and Chrysalis moved to dismiss the

---

[74] *Id.* ¶ 88. A provision of the Voting Agreement permitted FP Investors, Chrysalis, and others in the agreement to vote in favor of a superior proposal only if such proposal "would result in the preferred stock being redeemed in accordance with its terms." *Id.* ¶ 109.

[75] *Id.* ¶ 79.

[76] *Id.* ¶ 80. Several directors continued to serve on the Board, including Jones, McEwen, Perlman, and Surges. *Id.* ¶ 81. Francisco Partners' Vice President, Rozkin, joined the Board. *Id.* Management remained unchanged. *Id.*

[77] *Id.* ¶ 83.

[78] *Id.* (internal citations omitted).

[79] Compl.

[80] Answer to Pl.'s Verified Compl., D.I. 17.

14

Complaint as to allegations against them.[81]  After the parties finished briefing, I heard argument on January 23, 2020, and I considered the matter fully submitted at that time.

## II. ANALYSIS

The Plaintiffs bring a claim for breach of fiduciary duty against the parties they define as the "Buyout Group," which includes Defendants FP Investors, FP Healthcare, Perlman, Chrysalis, and Jones.[82]  The Plaintiffs allege that these Defendants "worked together as one cohesive controlling stockholder unit to take the Company private in a transaction that was . . . unfair to the Company's minority stockholders."[83]  The Plaintiffs allege that as a controlling stockholder group each of these Defendants owed fiduciary duties to the Company's stockholders.[84]  The Plaintiffs bring an additional breach of fiduciary duty claim against Defendants Perlman and Jones for violating their duties as directors on the Connecture Board.[85]

Defendants Chrysalis and Jones (the "Moving Defendants") moved to dismiss this action under Chancery Court Rule 12(b)(6).  In considering such a motion,

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are well-pleaded if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences

---

[81] Mot. to Dismiss the Verified Class Action Compl., D.I. 20.

[82] Compl. ¶¶ 110–18.

[83] *Id.* ¶ 111.

[84] *Id.* ¶ 113.

[85] *Id.* ¶¶ 119–25.

15

in favor of the nonmoving party; and (iv) dismissal is inappropriate unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof.[86]

However, I do not need to accept "conclusory allegations unsupported by specific fact" as true, nor must I "draw unreasonable inferences" in the Plaintiffs' favor.[87] I may consider facts in documents incorporated into the Complaint.[88]

> A. *The Complaint does not Adequately Allege that Chrysalis and Jones are Controlling Stockholders*

### 1. Legal Standards Regarding Controlling Stockholders and Control Groups

Under Delaware law, "controlling stockholders are fiduciaries of their corporations' minority stockholders."[89] That is, where a stockholder may control the corporate machinery to benefit itself, as by exercising voting control, it is a potential fiduciary. Where in fact it exerts such control, a controlling stockholder is bound by Delaware's common law fiduciary duties of loyalty and care. Conversely, stockholders who control only their own shares, and cannot exert corporate control, are owed fiduciary duties; they themselves are not obligated to act in the corporate

---

[86] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002) (footnotes and internal quotations omitted).

[87] *Thermopylae Capital Partners, L.P. v. Simbol, Inc.*, 2016 WL 368170, at \*9 (Del. Ch. Jan. 29, 2016) (quoting *Price v. E.I. duPont de Nemours & Co., Inc.*, 26 A.3d 162, 166 (Del. 2011)).

[88] *See in re Morton's Rest. Grp., Inc. S'holder Litig.*, 74 A.3d 656, 658–59 (Del. Ch. 2013); *In re Martha Stewart Living Omnimedia, Inc. S'holder Litig.*, 2017 WL 3568089, at \*3 (Del. Ch. Aug. 18, 2017).

[89] *eBay Domestic Holdings, Inc. v. Newmark*, 16 A.3d 1, 26 (Del. Ch. 2010) (citing *Ivanhoe Partners v. Newmont Mining Corp.*, 535 A.2d 1334, 1344 (Del. 1987)).

16

interest.  As our Supreme Court has noted, "a stockholder that owns less than half of a corporation's shares will generally not be deemed to be a controlling stockholder, with concomitant fiduciary responsibilities."[90]  A stockholder with a minority stake will only be deemed a controller if she actually "exercise[s] control over the business affairs of the corporation."[91]

It is also possible under Delaware law for several minority stockholders to band together to form a "control group."[92]  In this situation, though none are individually controllers, because they act in consort to exercise collective control, the stockholders in the group owe fiduciary duties.[93]  To demonstrate the existence of a control group, it is insufficient to identify a group of stockholders that merely shares parallel interests.[94]  To form a control group, the stockholders must be "connected in some legally significant way—e.g., by contract, common ownership, agreement, or other arrangement—to work together toward a shared goal."[95]  By

---

[90] *Weinstein Enters., Inc. v. Orloff*, 870 A.2d 499, 507 (Del. 2005).

[91] *Kahn v. Lynch Commc'ns Sys., Inc.*, 638 A.2d 1110, 1113–14 (Del. 1994) (quoting *Ivanhoe*, 535 A.2d at 1344).

[92] *Dubroff v. Wren Hldgs., LLC*, 2009 WL 1478697, at *3 (Del. Ch. May 22, 2009); *see also In re Nine Sys. Corp. S'holders Litig.*, 2014 WL 4383127, at *24 (Del. Ch. Sept. 4, 2014), *aff'd sub nom. Fuchs v. Wren Hldgs., LLC*, 129 A.3d 882 (Del. 2015) (TABLE) (noting that establishing control group is difficult showing).

[93] *Dubroff*, 2009 WL 1478697, at *3.

[94] *See id.*; *van der Fluit v. Yates*, 2017 WL 5953514, at *5 (Del. Ch. Nov. 30, 2017).

[95] *See Dubroff*, 2009 WL 1478697, at *3.

pooling resources in a plan by which they control the corporation, they become fiduciaries.

A control group, as generally understood, consists entirely of stockholders who, on their own, could not exercise control.[96] However, it is possible to conceive of a theoretical situation where, as with Aesop's lion freed from his constraints by the gnawing of a mouse, a stockholder with voting control might nonetheless be needful of aid from a minority stockholder to complete a control scheme, and might be willing, in order to get it, to cede some if its advantage to such a minority stockholder. In *Almond v. Glenhill Advisors LLC*,[97] this Court contemplated (in a post-trial opinion) this possibility; there, Chancellor Bouchard noted the conditions under which the minority stockholder might be bound as a fiduciary.[98] Were minority stockholders to form a control group with an independently-controlling stockholder, and if the independently-controlling stockholder agreed "to share with other stockholders, or to impose limitations on, its own control power (such as through a voting agreement) for some perceived advantage as part of a legally significant relationship with the other stockholders," the control group might all be

---

[96] *See Almond v. Glenhill Advisors LLC*, 2018 WL 3954733, at *25–26 (Del. Ch. Aug. 17, 2018), *aff'd Almond v. Glenhill Advisors, LLC*, 224 A.3d 200 (Del. 2019) (TABLE) ("the court is aware of [no case] where the analysis for determining the existence of a control group has been applied to glom on to a preexisting controlling stockholder additional stockholders to give them the status of a 'control group'"); *see also Dubroff*, 2009 WL 1478697, at *3.

[97] 2018 WL 3954733 (Del. Ch. Aug. 17, 2018).

[98] *Id.* at *26.

fiduciaries.[99]   In other words, the independently-controlling stockholder "would have to agree to limit its ability to act in its own self-interest as a controller in some material way" in order for the entire group to constitute fiduciaries.[100]  To my mind, the key attribute of the *Glenhill* analysis is the ability, via participation in the group, of the minority stockholders themselves to contribute to control of the corporate machinery.  The analysis thus begins with the perceived need of the controller.  To create a control group, a controller must go beyond merely permitting participation by other stockholders in the transaction.  Instead, the minority-holder's participation must be material to the controller's scheme to exercise control of the entity, leading to the controller ceding some of its control power to the minority-holders.  In this way, the minority stockholders involved wield their own levers of power as part of the group; this control of the corporate machinery makes them fiduciaries.  *Glenhill*, I note, does not suggest that a voting agreement, without more, is sufficient to demonstrate a control group in these circumstances.  As conceived by the Chancellor there, only if the controlling stockholder shares or materially limits its own control power through an arrangement (such as a voting agreement) could a control group potentially be found.[101]

---

[99] *Id.*

[100] *Id.*

[101] *Id.*

I adopt the sensible analysis from *Glenhill* to this pleading-stage review. In my view, where a controlling stockholder takes an action joined by minority stockholders, the latter can be deemed members of a control group, and thus fiduciaries, where two conditions exist. There must be an arrangement between the controller and the minority stockholders to act in consort to accomplish the corporate action, and the controller must perceive a need to include the minority holders to accomplish the goal, so that it has ceded some material attribute of its control to achieve their assistance.[102] In order to survive a motion to dismiss, a plaintiff advancing this unusual theory must plead facts that permit a reasonable inference that these conditions exist.

The Plaintiffs' first count for breach of fiduciary duty against Chrysalis and Jones—the Defendants who have moved to dismiss here—relies on the allegation that these two Defendants were part of a controlling stockholder group in the Transaction.[103] If Chrysalis and Jones are *not* part of a control group, then they do not owe fiduciary duties as controllers, and this count for breach of fiduciary duty must be dismissed.[104]

---

[102] I note that, as with most equitable analyses, this is a template for consideration, not a determinative test.

[103] Compl., ¶ 111.

[104] Jones owes fiduciary duties as a director, and the Plaintiffs bring a separate count against him for breach of these duties, discussed below in section II.B.

At the time of the Transaction, Chrysalis' and Jones' ownership stakes were approximately 11% and 0.02% respectively.[105] There can be no serious argument—and the Plaintiffs make none—that they independently exercised control. Francisco Partners, by contrast, through FP Investors, had a 56% ownership stake and so was independently a controller of Connecture (Francisco Partners has not moved to dismiss).[106] In order to successfully argue that Chrysalis and Jones were fiduciaries as members of a control group, therefore, the Plaintiffs must adequately allege that Chrysalis, Jones, and Francisco Partners were "connected in some legally significant way,"[107] *and* that Francisco Partners agreed "to share . . . or to impose limitations on, its own control power (such as through a voting agreement) for some perceived advantage as part of [that] legally significant relationship" with Chrysalis and Jones.[108] This would allow the inference that the latter wielded some control of the corporate machinery, and thus bore a fiduciary obligation to the entity and the minority.

---

[105] *See* Compl., ¶¶ 43 (alleging Chrysalis beneficially owned 11% of stock), 71 (alleging Jones' beneficially owned 57,696 common shares, equal to approximately a 0.02% ownership stake).

[106] *Id.* ¶¶ 43 (alleging 56% ownership), 45 ("As Connecture's majority stockholder, Francisco Partners had the power to remove and replace a majority of the Board's directors.").

[107] *See Dubroff*, 2009 WL 1478697, at *3.

[108] *Almond v. Glenhill Advisors LLC*, 2018 WL 3954733, at *26 (Del. Ch. Aug. 17, 2018).

## 2. The Plaintiffs do not Adequately Allege that Chrysalis and Jones were Part of a Control Group

The Plaintiffs rely on three allegations to show a control group. *First*, the Plaintiffs point out that the SEC defined Chrysalis and Jones—along with other purchasers—as "Purchaser Filing Parties."[109] This status meant the SEC considered them "affiliates" of the Company, and therefore required them to "express [their] position as to the fairness of the proposed Merger to the Company's 'unaffiliated security holders.'"[110] The SEC defines "affiliate" as "a person that directly or indirectly through one or more intermediaries controls, is controlled by, or is under common control with such issuer."[111] The SEC defines "control" as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise."[112] To my mind, this SEC determination is not dispositive of the common-law issue of control before me. To withstand the Motion to Dismiss, the Plaintiffs must plead non-conclusory facts that, taken as true, permit the reasonable inference that the Moving Defendants were part of a control group.

---

[109] Compl., ¶ 83.

[110] *Id.*

[111] 17 C.F.R. § 240.13e-3(a)(1).

[112] 17 C.F.R. § 230.405; 17 C.F.R. § 240.12b-2.

*Second*, the Plaintiffs argue that the Voting Agreement shows a legally significant relationship. FP Investors and Chrysalis (but not Jones) entered the Voting Agreement with Connecture, obliging them to vote their shares in favor of the Transaction.[113] The Plaintiffs argue this shows that at least Chrysalis and FP Investors were contractually bound to act toward a shared goal of taking the Company private through the Transaction.

*Third*, the Plaintiffs point to the coordinated actions, prior to the contemplation of the going-private transaction, taken by Francisco Partners, Chrysalis (and, to a much lesser extent, Jones). FP Investors and Chrysalis participated exclusively together in two separate private placements, through which they obtained a collective 68% ownership stake.[114] Having acquired this stake, they entered the Voting Agreement.[115] Per the complaint, Jones helped "facilitate" Chrysalis' participation, and he then added his shares to the equity rollover just prior to the Transaction's close, effectively (per the Plaintiffs) making Jones himself a member of the affiliated group.[116]

The allegations described above show coordinated efforts and contractual obligations that may permit the reasonable inference that Chrysalis, Jones, and

---

[113] Compl. ¶ 88.

[114] *Id.* ¶¶ 35–38, 41–43, 85–86.

[115] *Id.* ¶ 88.

[116] *Id.* ¶¶ 36, 87.

23

Francisco Partners had more than mere parallel investing interests.[117] However, reaching this inference is merely the first step in the *Glenhill* analysis I have adopted here. Francisco Partners, as 56% owner, could have closed the Transaction and taken the Company private entirely on its own. It did not need the participation of other minority stockholders to achieve this goal. To demonstrate a control group, the Plaintiffs must point to Francisco Partners' sharing or material self-limiting of its control powers, to obtain participation of the Moving Defendants for Francisco Partners' perceived self-advantage. The Complaint fails to allege such action.

The Plaintiffs only note that by permitting Chrysalis (and Jones) to join the equity rollover, "Francisco Partners agreed to dilute its proportionate stake in [the post-Transaction company]. This concession, which enabled Francisco Partners to garner the support of Chrysalis . . . and Jones . . . was a self-imposed limitation on Francisco Partners' self-interest."[118] But this cannot satisfy the analysis employed in *Glenhill*. If it could, every time minority stockholders, without the power to

---

[117] In their briefing, the Plaintiffs rely heavily on *In re Hansen Med., Inc. S'holders Litig.*, 2018 WL 3025525 (Del. Ch. June 18, 2018). In that case, this Court correctly noted that the analysis of whether a control group is present is "a fact-intensive inquiry" often requiring evidence that makes it "particularly difficult to ascertain at the motion to dismiss stage. . ." *Id.* at *5–6. The Plaintiffs argue that the history of cooperation, the Voting Agreement, and the SEC's identification of the Defendants as "affiliates" clears this low hurdle described in *Hansen Med. See* Pl.'s Answering Br. in Opp'n to Defs. David A. Jones, Jr. and Chrysalis Ventures II, L.P.'s Mot. to Dismiss the Verified Class Action Compl., D.I. 34 ("Pl.'s Answering Br."), at 19–25. *Hansen Med.*, however, lacked the defining feature here—an independently-controlling stockholder—that, for reasons explained herein, requires a modified analysis.

[118] Pl.'s Answering Br., at 21–22.

control the corporation, participated in a transaction along with a controller, the controller's interest would be diluted, and the stockholders would be tagged as controlling fiduciaries. This is not Delaware law. Demonstrating a control group under the *Glenhill* rationale would require Francisco Partners not just to agree to dilute its self-interest, but to "agree to limit . . . its ability to act in its own self-interest *as a controller in some material way*."[119] Put another way, if the Plaintiffs could have pled that Francisco Partners needed something material in way of its take-private scheme, and was accordingly willing to give up some material part of its control attributes to Chrysalis and Jones to get it, they may have adequately made the allegation that a control group existed here. The Complaint, however, points to neither *quid* nor *quo*—it describes nothing Francisco Partners needed or ceded to the Moving Defendants, other than the bare right to roll over shares. Again, that is insufficient. I cannot reasonably infer the sharing of control power by Francisco Partners from the allegations in the Complaint.

In conclusion, I find that to the extent the Complaint makes allegations of a "legally significant relationship" between Francisco Partners, Chrysalis, and Jones, via the Voting Agreement, it fails to allege facts allowing the inference that Francisco Partners, an independently-controlling stockholder, shared or limited its

---

[119] *Almond v. Glenhill Advisors LLC*, 2018 WL 3954733, at *26 (Del. Ch. Aug. 17, 2018) (emphasis added).

25

control power with the Moving Defendants in a material way, in order to obtain their necessary participation in the transaction.[120]

Accordingly, I cannot find that Chrysalis and Jones were members of a control group. The Moving Defendants are not controlling stockholders and do not owe fiduciary duties concomitant with that status.[121] They were free to sell or roll over their equity as they saw fit as investors.[122] Count I of the Complaint is therefore dismissed against Chrysalis and Jones.

*B. Consideration of the Plaintiffs' Allegations that Jones Breached his Fiduciary Duties as a Director May Benefit from Supplemental Briefing*

The Plaintiffs separately allege that Jones breached his fiduciary duties in his capacity as the Chairman of Connecture's Board. Jones benefits from an exculpatory provision in Connecture's charter under 8 *Del C.* § 102(b)(7) that shields him from liability for violations of his duty of care.[123] Therefore, to survive the Motion to Dismiss in this post-closing damages action, the Plaintiffs must plead a

---

[120] *Glenhill* itself emphasized that a control group containing both minority and independently-controlling stockholders represented an unlikely scenario: "Given that the controller already is the proverbial 800-pound gorilla imbued with fiduciary obligations to guard against acting 'selfishly to the detriment of the corporation's minority stockholders,' it is not readily apparent why this scenario would arise." *Id.* Wherever it may arise, it is not here.

[121] *Weinstein Enters., Inc. v. Orloff*, 870 A.2d 499, 507 (Del. 2005).

[122] *Ivanhoe Partners v. Newmont Mining Corp.*, 535 A.2d 1334, 1344 (Del. 1987) ("it is well established law that nothing precludes . . . a stockholder from acting in its own self-interest.").

[123] Transmittal Aff. of Deborah S. Birnbach in Support of David A. Jones, Jr. and Chrysalis Ventures II, L.P.'s Opening Br. in Support of their Mot. to Dismiss the Verified Class Action Compl., D.I. 30 ("Birnbach Aff."), Ex. 5, Sixth Am. And Restated Certificate of Incorporation of Connecture, Inc., at Art. VII.

non-exculpated claim, which requires sufficiently alleging Jones was either self-interested, lacked independence, or acted in bad faith.[124]

The Plaintiffs' allegations largely involve Jones' association with Chrysalis, which they argued was itself a member of the control group. For the reasons explained above, however, I have found that Chrysalis was not a controller and did not owe fiduciary duties in the Transaction. Accordingly, it might be helpful to the Court to have supplemental briefing disclosing the Plaintiffs' theory against Jones in light of that finding. I give the parties the option of supplementing their arguments, therefore.

### III. CONCLUSION

Defendants Chrysalis and Jones' Motion to Dismiss the claims against them in Count I of the Complaint is granted. An appropriate form of order is attached.

I reserve decision on Jones' Motion to Dismiss the Plaintiffs' claims against him for breach of his duty of loyalty as a director. The Parties should inform me

---

[124] *In re Cornerstone Therapeutics Inc, S'holder Litig.*, 115 A.3d 1173, 1175–76 (Del. 2015) ("A plaintiff seeking only monetary damages must plead non-exculpated claims against a director who is protected by an exculpatory charter provision to survive a motion to dismiss, regardless of the underlying standard of review for the board's conduct"); *In re Essendant, Inc. S'holder Litig.*, 2019 WL 7290944, at *7 (Del. Ch. Dec. 30, 2019) ("given [defendant's] exculpatory charter provision, in order to survive the . . . Board's Motion to Dismiss, the Complaint must state valid, non-exculpated claims."); *Nguyen v. Barrett*, 2016 WL 5404095, at *3 (Del. Ch. Sept. 28, 2016) ("[W]hen asserting a . . . claim for damages against directors post-close, a plaintiff must allege facts making it reasonably conceivable that there has been a non-exculpated breach of fiduciary duty by the board. . ." (citing *Chen v. Howard*, 87 A.3d 648, 691 (Del. Ch. 2014))).

within one week whether they wish to submit limited supplemental briefing on the issue, and, if so, on what schedule.

**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| JIM GILBERT and BARRETT O'DONNELL, Individually and On Behalf of All Others Similarly Situated, | ) ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | C.A. No. 2018-0453-SG |
| | ) | |
| | ) | |
| EZRA PERLMAN, DAVID A. JONES, JR., FRANCISCO PARTNERS IV, L.P., FRANCISCO PARTNERS IV-A, L.P., FP HEALTHCARE HOLDINGS, INC., FP HEALTHCARE MERGER SUB CORPORATION, and CHRYSALIS VENTURES II, L.P., | ) ) ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

AND NOW, this 29th day of April, 2020, for the reasons set forth contemporaneously in the attached Memorandum Opinion dated April 29, 2020, IT IS HEREBY ORDERED that Defendants Chrysalis and Jones' Motion to Dismiss Count I of the Complaint is GRANTED.

IT IS SO ORDERED.

/s/ Sam Glasscock III

Vice Chancellor

29